**Opinion issued May 3, 2001**



**In The**

*Court of Appeals*

**For The**

*First District of Texas*

_____

**NO. 01-00-00143-CV**
_____

**VALERO MARKETING & SUPPLY COMPANY, Appellant**

**V.**

**KALAMA INTERNATIONAL, LIMITED LIABILITY COMPANY, Appellee**

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 97-49288**

**O P I N I O N**

This is an appeal from a summary judgment disposing of a breach of contract

complaint, rendered in favor of appellee, Kalama International, LLC. ("Kalama").

Appellant, Valero Marketing and Supply Company ("Valero"), complains the trial

court erred in (1) granting Kalama's summary judgment motion and denying Valero's summary judgment motion; (2) considering "usage of trade" evidence and ignoring the existence of a fact issue on "usage of trade"; and (3) not finding Kalama was required under the Uniform Commercial Code to notify Valero of the requirement that a methanol dedicated or methanol clean barge was necessary to take delivery of methanol. We affirm.

### Background Facts

Justice Oliver Wendell Holmes warned, "In most contracts men take the risk of events over which they have imperfect or no control." *Ferry v. Ramsey*, 277 U.S. 88, 95, 48 S. Ct. 443, 444, (1928). The undisputed facts of this case illustrate this admonition.

After negotiating a price, a third-party broker brought together Valero, a refiner and marketer of petroleum products, and Kalama, a marketer of various chemicals. Valero and Kalama subsequently entered into a contract, drafted by Valero, dated June 16, 1997, wherein Kalama agreed to sell Valero 20,000 barrels of methanol ASTM D 11552-89[1] at $.59 per gallon. The contract specified Valero would take delivery of

---

[1] This type of methanol is 99.85% pure methanol. Methanol is defined as "a colourless, volatile, poisonous liquid with a pungent odour which is produced mainly by the high-pressure reduction of carbon monoxide or dioxide with hydrogen and is used as an intermediate in the synthesis of formaldehyde, as a solvent, and as a denaturant for ethyl alcohol." THE COMPACT OXFORD

the methanol between June 23, 1997 and June 30, 1997 "via Valero's barge, at Plaquemine, LA."

The designated point of delivery and loader of the methanol was Georgia Gulf Corporation, a third-party chemical company located in Plaquemine, Louisiana.[2] The parties also jointly hired a third-party inspection company, SGS Consulting and Inspection, Inc. ("SGS"), to inspect the barge upon its arrival at the port; Valero and Kalama split the costs of the inspection. Thus, SGS was a contract inspector working for both Valero and Kalama.

Valero hired the *Genie Cenac*, a third-party barge, to take delivery of the methanol. On June 18, 1997, Valero sent a nomination to Kalama detailing the volume of product and designating the *Genie Cenac* as the barge to receive delivery. The nomination also listed the prior cargo of the *Genie Cenac* as unleaded gasoline. Kalama received the nomination; no objection was made.

On June 30, 1997, before the *Genie Cenac* docked at Georgia Gulf, SGS inspected the barge and rejected it for "cleanliness to carry: Methanol"; this was the last date on which delivery could occur under the terms of the contract. The *Genie*

---

ENGLISH DICTIONARY 1072 (2d ed. 1991).

[2]    Kalama stored methanol at Georgia Gulf, a corporation separate and apart from Kalama.

3

*Cenac* had been cleaned prior to docking, but despite that cleaning, gasoline vapors and puddles remained on the barge from its prior cargo of unleaded gasoline. Georgia Gulf refused to load the barge because it could only load the methanol onto a methanol dedicated or methanol clean vessel.[3]

After this rejection, Kalama agreed to extend the time allowed for delivery until July 2, 1997, and Valero agreed to pay for the cleaning of the *Genie Cenac*.[4] Valero subsequently took the *Genie Cenac* to be cleaned again and have it "stripped and blown dry." On July 1, 1997, the *Genie Cenac* again attempted to load at Georgia Gulf, but SGS rejected the barge a second time, noting the same problems that existed on the first inspection.

On July 2, 1997, Kalama sent a letter to Valero terminating the contract because Valero "had failed to produce a suitable barge to load the methanol within the

---

[3]  Georgia Gulf did not have the required permit from the State of Louisiana to recover gasoline vapors, which would have been necessary if Georgia Gulf had loaded the methanol with the presence of gasoline puddles and vapors. Thus, loading the *Genie Cenac* would have violated Georgia Gulf's permit and would have risked potentially contaminating Georgia Gulf's entire plant and shutting it down because the barge was not methanol dedicated or methanol clean.

[4]  We do not address the issue of contract modification as we may not consider any ground not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. *See* TEX. R. CIV. P. 166a (c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 676 (Tex. 1979); *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 323 (Tex. App.—Houston [1st Dist.] 1995, no writ).

4

contractual deadline." When Kalama terminated the contract, Valero was forced to cover at a higher price. Valero sent a letter to Kalama demanding to be paid damages in the amount of $82,135.52.[5]

Although Kalama was not aware before this incident that Geogia Gulf did not have a permit to recover gasoline vapors, Kalama was aware Georgia Gulf required barges accepting delivery of methanol to be methanol dedicated or methanol clean.

Danny Oliver, a Valero employee who drafted the agreement in question, testified that he did not know Georgia Gulf required methanol clean or methanol dedicated barges. However, Cathy Cazes, a Georgia Gulf employee, testified that Georgia Gulf had previously loaded methanol onto Valero barges "more than once or twice" and that Valero would have used a methanol dedicated or methanol clean barge because Georgia Gulf has always required methanol dedicated or methanol clean barges.[6] Valero claimed in its summary judgment motion and in its appellate brief that

---

[5] Valero's alleged damages include the cost of cover, various incidental and consequential damages, and attorney's fees. The actual amount sought by Valero in this suit is $82,277.40.

[6] Cazes testified in her deposition as follows:

> Q Has Georgia Gulf loaded methanol onto any Valero barges in the past that you can recall?
>
> A Yes, sir, we have.

the president of Georgia Gulf, Frank Vendt, testified Valero "had no prior dealings with Georgia Gulf"; however, this is not what Vendt said.  The record shows Vendt either could not remember or did not personally know of Valero or any prior dealings between Valero and Kalama.[7]  Thus, his testimony does not contradict Cazes'

---

> Q And, I know this is a difficult question, do you have any idea how many times?
>
> A No, sir.
>
> Q Would it be more than once or twice?
>
> A Yes, sir, I think it's more than once or twice.
>
> Q Would they have had to use a dedicated barge or a clean barge at that time also?
>
> A Yes, sir, all barges have to be cleaned.

[7] Vendt testified in his deposition as follows:

> Q And just to try to clear something up; in your mind's eye, can you recall any particular time when Valero may have purchased methanol from the Georgia Gulf facility in the past?
>
> A I couldn't tell you in the past, no.  I couldn't tell you.  Any time or dates or anything.  Or by what means.
>
> Q I'm sorry, I didn't get the last part?
>
> A Or by what means.  I couldn't tell you how - - if we ever did, or how it was loaded into what vessel, or what kind of vessel, what mode.

testimony.

Peggy Pane, a Valero supply coordinator, testified that Valero had previously used methanol dedicated or clean barges and that two Valero refineries preferred methanol to be transported in methanol dedicated or clean barges. She sometimes called these refineries to see whether they would accept a barge with another previous cargo. Pane also explained that the inspection company represents both the buyer and the seller, who split the cost of the inspection, and that the inspection company inspects the barge to see whether any puddles are in the barge and whether it is in good shape for loading.

## Procedural Background

Valero filed suit against Kalama seeking damages for breach of contract. Kalama answered with a general denial, and further pleaded several alternative defenses, including: (1) Valero caused the incident and damages as a result of its own negligence, actions, omissions, and failure to act; (2) Valero failed to provide a suitable container to transport the methanol; (3) Valero's failure to provide a suitable container to transport the methanol was a breach of the contract, excusing further

---

Q    But can you recall whether they have or not, just in general?

A    Honestly, the first time that I ever heard of Valero was this incident right here.

7

performance by Kalama; (4) the actions of third parties rendered performance impossible; (5) the contract was modified; and (6) the incident and damages were caused solely by the acts and conduct of parties over whom Kalama had no control.

Kalama moved for summary judgment claiming there was no evidence Valero tendered performance because Valero failed to provide a suitable barge to receive the methanol and, thereby, breached the contract. Kalama contended proof of Valero's breach was demonstrated by: (1) the custom and usage of trade in the methanol business; (2) *Valero's actual or constructive knowledge that a methanol dedicated or a properly cleaned barge was necessary to load Methanol ASTM D1152-89*; (3) two failed barge inspections; and (4) Valero's failure to meet the product quality specifications in its nominations.

Valero replied by filing its own motion for summary judgment. Valero asserted the trial court could determine as a matter of law Kalama breached the contract because Kalama did not deliver the methanol as required under the contract and failed to notify Valero of "special requirements necessary to take delivery" pursuant to section 2.503(a) of the Texas Business and Commerce Code. TEX. BUS. & COMM. CODE ANN. § 2.503(a) (Vernon 1994). Valero asserted that "[d]ue to [Kalama and Georgia Gulf's] prior dealings, Kalama was aware that Geogia Gulf had special requirements for barges." Valero claimed it tendered performance when the *Genie*

*Cenac* arrived at Georgia Gulf's facility, but Kalama "did not deliver the product as required by the contract." Moreover, Valero maintained that it "had no prior dealings with Georgia Gulf." Valero blamed Kalama for the failure of delivery, asserting that Kalama was obligated to inform Valero of the necessity of a methanol dedicated or methanol clean barge and that "[a] buyer cannot be expected to furnish facilities with special requirements if it does not know what the special requirements are."

The trial court rendered summary judgment for Kalama.[8]

## Summary Judgment Standard of Review

The purpose of the summary judgment rule is to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and there is no genuine issue of fact. *Gaines v. Hamman*, 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). The basic standards for reviewing a motion for summary judgment are well established. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). The Supreme Court of Texas has mandated the following standards:

1.    The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

---

[8]    The trial judge signed a general judgment, not specifying the grounds for rendering the summary judgment.

9

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Id.* When a defendant is the movant, as in the present case, we must be alert to additional rules controlling summary judgment practice. The question on appeal, as well as in the trial court, is not whether the summary judgment proof raises fact issues with reference to the essential elements of the plaintiff's cause of action, but, rather, whether the summary judgment proof establishes as a matter of law there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970).

When a party moves for summary judgment under Texas Rule of Civil Procedure 166a(i), on the ground that there is no evidence of one or more essential elements of the non-movant's claims upon which the non-movant would have the burden of proof at trial, the movant does not bear the burden of establishing each element of its own claim or defense. TEX. R. CIV. P. 166a(i). Rather, the non-movant must present evidence raising a genuine issue of material fact on the challenged elements. *Id.*

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard when reviewing a no-evidence summary

judgment as we apply when reviewing a directed verdict. *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70 (Tex. App.—Austin 1998, no pet.). Our task as an appellate court is to ascertain whether the non-movant produced any evidence of probative force to raise a fact issue on the material questions presented. *See id.* We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

A no-evidence summary judgment is improperly rendered if the non-movant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *Greathouse v. Alvin Indep. School Dist.*, 17 S.W.3d 419, 423 (Tex. App.—Houston [1st Dist.] 2000, no pet.). "More than a scintilla of evidence exists when the evidence . . . 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (citations omitted). When the issue is one of no evidence or conclusive evidence, the issue is a question of law. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992).

When both parties move for summary judgment, we review the summary judgment evidence presented by both sides and grant the relief the trial court should

have granted.  *See Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

Where, as here, the summary judgment order does not specify the grounds relied upon, we will affirm the summary judgment if any of the grounds presented in the motion are meritorious.  *See Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

**Kalama's No-Evidence Motion for Summary Judgment**

In its first point of error, Valero contends the trial court erred by rendering summary judgment for Kalama and denying summary judgment for Valero.  Kalama's summary judgment motion claims there was no evidence Valero tendered performance under the contract because Valero failed to provide "facilities reasonably suited to the receipt" of the methanol.  *See* TEX. BUS. & COM. CODE ANN. § 2.503(a)(2) (Vernon 1994).  Conversely, Valero contends it did tender performance and, in its third point of error, that Kalama was required to notify Valero that a methanol dedicated or methanol clean barge was necessary to take delivery of the methanol.

We address the tender of performance and notification issues together because these issues directly relate to each other and are dispositive of the case.

A.    **Breach of Contract**

The essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) *performance or tendered performance by the plaintiff*; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result

12

of the breach. *Hussong*, 896 S.W.2d at 326 (emphasis added). When the evidence is undisputed regarding a person's conduct under a contract, the court as a matter of law determines whether the conduct shows performance or breach of a contract obligation. *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 186 (Tex. App.—Austin 1998, pet. denied).

Pursuant to the contract, Valero arranged for the *Genie Cenac* to pick up the methanol at Plaquemine, Louisiana. However, SGS rejected the barge two times because of a strong gasoline odor and standing liquid in the barge, and thus, Georgia Gulf refused to load the methanol onto the *Genie Cenac.*

We must determine, under the undisputed facts, whether Valero performed or tendered performance under the contract when the *Genie Cenac* arrived at Georgia Gulf.

## B. Application of the Uniform Commercial Code

The contract between Valero and Kalama is silent as to what type of barge is required to take delivery of the methanol, so in determining whether Valero's production of the *Genie Cenac* on June 30, 1997 at Geogia Gulf constituted performance or a tender of performance, we turn to the Uniform Commercial Code ("U.C.C."). *See* TEX. BUS. & COM. CODE ANN. §§ 2.101-2.725 (Vernon 1994 & Supp. 2001). Chapter 2 of the U.C.C. governs this contract because it is a contract for the

13

sale of goods. *See* TEX. BUS. & COM. CODE ANN. §§ 2.102, 2.105(a) (Vernon 1994).

The U.C.C. defines a "contract" as "the total legal obligation which results from the parties' agreement as affected by [the U.C.C.] and any other applicable rules of law." TEX. BUS. & COM. CODE ANN. § 1.201 (11) (Vernon Supp. 2001). Under the U.C.C., "the *obligation* of the *seller* [Kalama] is to *transfer and deliver* and that *of the buyer* [Valero] is *to accept and pay* in accordance with the contract." TEX. BUS. & COM. CODE ANN. § 2.301 (Vernon 1994) (emphasis added). In the absence of a specified place for delivery, "the place for delivery of goods is the seller's place of business," but in a contract for the sale of identified goods which the parties know at the time of contracting are in some other place, "that place is the place for their delivery." TEX. BUS. & COM. CODE ANN. § 2.308 (1), (2) (Vernon 1994). Thus, Valero, as the buyer, had the obligation to accept the methanol at Georgia Gulf.

"Tender of delivery *requires* that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification *reasonably necessary* to enable him to take delivery." TEX. BUS. & COM. CODE ANN. § 2.503(a) (Vernon 1994) (emphasis added). Kalama instructed Georgia Gulf to hold the methanol and deliver it to Valero. During oral argument, Valero claimed this was an "imperfect" tender because Kalama failed to notify Valero of the necessity of a methanol dedicated or methanol clean barge. We disagree. "The *manner*, time, and place for tender are

14

determined by the agreement and [the U.C.C.] . . . ." TEX. BUS. & COM. CODE ANN. § 2.503(a) (Vernon 1994) (emphasis added). Because the material facts are not disputed, "manner of tender," which is the real issue in this case, is a question of law to be decided by the court.

Pursuant to the U.C.C., "unless otherwise agreed[,] the buyer "*must furnish facilities reasonably suited* to the *receipt* of the goods." TEX. BUS. & COM. CODE ANN. §2.503(a)(2) (Vernon 1994) (emphasis added).[9] This obligation of the buyer, Valero, is "*no part*" of the seller's, Kalama's, tender. TEX. BUS. & COM. CODE ANN. § 2.503(a)(2) cmt. 4 (Vernon 1994) (emphasis added). "'Receipt' of goods means *taking physical possession of them*." TEX. BUS. & COM. CODE ANN. § 2.103(a)(3) (Vernon Supp. 2001) (emphasis added). Therefore, Valero, as a matter of law, had the responsibility of supplying a vessel suited to taking physical possession of the methanol.

Furthermore, "'*tender*' connotes such performance by the tendering party *as puts the other party in default* if he fails to proceed in some manner." TEX. BUS. & COM. CODE ANN. § 2.503(a) cmt. 1 (Vernon 1994) (emphasis added). Here, Kalama

---

[9]  Facilities are defined as "[t]hat which promote the ease of any action, operation, transaction, or course of conduct. . . . As applied to carriers, *means everything necessary for* . . . the safety and prompt transportation of freight." BLACK'S LAW DICTIONARY 705 (4th ed. 1968) (emphasis added).

15

had Georgia Gulf hold the methanol and requested delivery to Valero; Kalama could do no more. Kalama's tender put Valero in default when Valero failed to physically take possession of the methanol. Valero's production of the *Genie Cenac* at Georgia Gulf did not constitute a tender of performance because Valero was unable to take physical possession of the methanol. Thus, Valero's performance did not put Kalama in default. *See id.*

Valero's argument that Kalama had the responsibility to notify Valero that a methanol dedicated or methanol clean barge was necessary to load the methanol is without merit. Under the general definitions of the U.C.C., a person has "notice" of a fact when:

(A)    he has actual knowledge of it; or

(B)    he has received a notice or notification of it; or

(C)    from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

TEX. BUS. & COM CODE ANN. § 1.201(25) (Vernon Supp. 2001). A "[p]erson" includes an "organization," which in turn includes a "corporation." TEX. BUS. & COM CODE ANN. §§ 1.201(30), (28) (Vernon Supp. 2001).

We hold, under the undisputed facts of this case, that notice by Kalama to Valero of Georgia Gulf's methanol dedicated or methanol clean barge requirement was not "reasonably necessary" because (1) such a barge was already needed to take

16

delivery of the methanol specified in the contract, and (2) Valero, at the very least, had reason to know a methanol dedicated or methanol clean barge could be required. *See* TEX. BUS. & COM CODE ANN. § 1.201(25)(C).

The contract in question called for the methanol to be 99.85% pure. Valero claims it was willing to waive the required specification because it did not really matter to Valero whether the methanol was 99.85% pure.[10] However, 99.85% pure methanol is what Valero contracted for, and, in the context of what notice was reasonably necessary, this contract specification is dispositive.

The summary judgment proof showed that, if the methanol were loaded onto an unclean barge, the methanol would have deviated from the contracted for specifications. Harinder B.S. Jalli, vice president of Kalama, testified, "Valero's barge was contaminated with unleaded gasoline. The slightest bit of unleaded gasoline or

---

[10] Specifically, Valero contends any contamination from gasoline remaining on the *Genie Cenac* did not matter because the contract provided that "[q]uality determination shall be made on representative samples of product taken from the shore tank prior to delivery" and that title shall pass to Valero before the methanol reached the barge, "at the flange connection between the vessel's permanent manifold connection and the shore line at Plaquemine, LA." Valero argues any contamination after that point would not have been Kalama's responsibility and would not have put Kalama in breach of the contract. This is true, but unpersuasive. Valero does not contend Kalama knew or should have known before this problem arose that Valero did not actually need 99.85% pure methanol. Valero ordered that particular product, and it was reasonable for Kalama to assume that Valero needed it as ordered and would be prepared to receive it as ordered, rather than in a contaminated state.

17

hydrocarbon vapor would make the Methanol ASTM D1152-89 off specifications."

Although Oliver stated in an affidavit that "insignificant levels of a different product–for example, the gasoline puddles on the *Genie Cenac*–seldom cause the methanol to be off-specification once loaded on a barge," he testified in his deposition that loading methanol onto a barge that was not dedicated could potentially disturb the quality of the methanol.[11]  Also, Pane testified, "If you are loading methanol behind any other cargo than methanol, it will throw the methanol off spec [sic] for pure methanol usage."

Logic dictates that mixture of another substance with 99.85% pure methanol will dilute the methanol.  Therefore, a methanol dedicated or methanol clean barge was necessary to maintain the specifications contracted for by Valero regardless of the requirements of Georgia Gulf.  Why should Kalama be required to notify Valero that Georgia Gulf required the use of a methanol dedicated or methanol clean barge when in fact such a barge was necessary for Valero to take possession of the contracted for 99.85% pure methanol?  Such notice was not "reasonably necessary."

Additionally, Valero should have known a methanol dedicated or methanol clean barge could be required to take delivery of the contracted for methanol.  The

---

[11]    Oliver's statement in his affidavit does not contradict his deposition because in both he recognizes the possibility of contamination of the methanol if it is loaded onto an unclean barge.

18

undisputed testimony of Cazes shows that Valero had dealt with Georgia Gulf prior to this incident and that Georgia Gulf has always required the use of a methanol dedicated or methanol clean barge to take delivery of methanol. Moreover, the uncontradicted testimony of Pane reveals that Valero itself had previously used methanol dedicated or methanol clean barges to transport methanol; that two of Valero's own refineries prefer using methanol dedicated or clean barges to transport methanol; and that she sometimes called these refineries to check whether a barge with another previous cargo was acceptable.

These facts, coupled with the fact that a methanol dedicated or methanol clean barge was necessary to take possession of the methanol specifically contracted for, demonstrate Valero had reason to know at the time in question that such a barge could be required to take delivery of the methanol. Therefore, under the undisputed facts of this case, we hold Kalama had no duty to notify Valero of Georgia Gulf's requirement that barges must be methanol dedicated or methanol clean to take delivery of methanol. Valero had the legal responsibility of supplying a barge suited to taking possession of the methanol, and it failed to supply a suitable barge.

Accordingly, there is no evidence to support a tender of performance by Valero, one of the necessary elements to maintain a cause of action for breach of contract. The trial court correctly granted Kalama's no-evidence motion for summary

19

judgement and properly denied Valero's motion for summary judgment. We overrule Valero's first and third points of error.

Because we base our holding on the undisputed facts of this case without considering usage of trade evidence, we do not address Valero's second point of error.

**Conclusion**

Although Oliver, the Valero employee who drafted the contract in question, testified he did not know of Georgia Gulf's requirement of a methanol dedicated or methanol clean barge, the undisputed facts show such a barge was necessary for Valero to take delivery of the methanol contracted for regardless of Georgia Gulf's requirements. Additionally, from all the facts and circumstances known to Valero at the time, Valero had reason to know such a barge could be required. It would contradict the U.C.C. and common sense to require Kalama to notify Valero of that which it, as a corporation, had reason to know. To put Justice Holmes's admonition in full context:

> As a matter of law there is nothing new in charging a party with knowledge of what is his duty to know . . . . But the essential thing is that whether in a roundabout or a perfectly natural way [a] statute has said if you take the office you must take the consequences of knowledge whether you have it or not. In most contracts men take the risk of events over which they have imperfect or no control.

*Ferry*, 48 S. Ct. at 444, 277 U.S. at 95.

We affirm the judgment.

20

                                        Terry Jennings
                                        Justice

Panel consists of Justices Cohen, Jennings, and Duggan.[12]

Publish TEX. R. APP. P. 47.

---

[12]     The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District
         of Texas at Houston, participating by assignment.