Opinion issued March 30, 2004











In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00017-CV




DOUGLAS SPECTOR, ANA SPECTOR, JULIA HOLLENBECK, DAVID
KILLOUGH, and RODGER PETERS, Appellants

V.

NORWEGIAN CRUISE LINE LTD. D/B/A NORWEGIAN CRUISE LINE,
Appellee




On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2000-39257




MEMORANDUM OPINION

          Appellants, Douglas Spector, Ana Spector, Julia Hollenbeck, David Killough,
and Rodger Peters (collectively, “appellants”), appeal from the trial court’s order
refusing to certify two classes in appellants’ lawsuit against appellee, Norwegian
Cruise Line Ltd. d/b/a Norwegian Cruise Line (“NCL”). See Tex. Civ. Prac. & Rem.
Code Ann. § 51.014(a)(3) (Vernon Supp. 2004). We affirm.
Background
          Appellants are mobility-impaired individuals who use scooters or wheelchairs
and those individuals’ traveling companions. Appellants were passengers on one of
two NCL vessels, the NORWEGIAN SEA and the NORWEGIAN STAR, on NCL’s
“Texaribbean Cruise,” which departed from the Port of Houston and sailed to Cancun
or Calica, Cozumel, and Roatan.
          Appellants alleged (and at the certification hearing produced supporting
evidence) that, before the cruises, they were told—verbally or in writing, impliedly
or expressly—that the vessels or related port excursions were accessible to mobility-impaired passengers and that those passengers would have assistance on and off the
ship. Appellants alleged and produced evidence that, after they had boarded the
vessels, they discovered that, because they were mobility-impaired, they could not
access many vessel areas (including, but not limited to, public restrooms,
entertainment facilities, dining areas, swimming pools, and elevators), they were
relegated to four cabins in undesirable areas of the ship, they were denied discounts
available to passengers without disabilities, they were generally required to pay for
a ticket for a companion to accompany them, they had no evacuation plan available
to them, and they were effectively or expressly denied full access to ports of call.
          Appellants sued NCL


 for contract breach, fraud or fraudulent inducement,
unjust enrichment, and negligent misrepresentation; for violations of the Deceptive
Trade Practices–Consumer Protection Act (“DTPA”)


 and chapter 121 of the Texas
Human Resources Code,


 which prohibits certain discrimination; and for a declaration
that NCL’s cruise ships were subject to chapter 121 and that NCL had violated
appellants’ rights or that appellants were entitled to refunds. Appellants sought actual
and treble damages for DTPA violations; actual damages for their contract-breach
claims; and the statutory minimum presumed damages of $100 for their
discrimination claims under chapter 121.


 Alternatively, appellants sought
reimbursement under the equitable principle of unjust enrichment. NCL disputed
most of appellants’ factual allegations and argued that chapter 121 of the Human
Resources Code, and related statutes and architectural standards, did not apply to
NCL’s vessels because the vessels were foreign-flagged, were built before the
statutes’ application date, or did not sail in Texas waters.
          Appellants moved for certification with respect to all of their claims except
those for fraud, fraudulent inducement, and negligent misrepresentation.


 The two
classes that appellants sought to certify were:
●all passengers who at all times used scooters or wheelchairs for
mobility and who lived in, or sailed from, Texas, and who sailed
on NCL cruises from August 1, 1996 to the present (“the
mobility-impaired class”)


 and

 
●all companions of passengers with mobility impairments who
lived in, or sailed from, Texas and who sailed on NCL cruises
from August 1, 1996 to the present (“the companion class”).




          After a hearing, the trial court denied appellants’ certification motion without
stating grounds and denied appellants’ request for fact findings and legal conclusions. 
Preliminary Matters
A.      Spoliation Inference
          In issue two, appellants claim that the trial court erred in “failing to adopt or
properly [to] apply a spoliation inference” because NCL destroyed evidence that
appellants claim related to class certification.
          “[O]nce a party has notice of a potential claim, that party has a duty to exercise
reasonable care to preserve information relevant to that claim. Because of this duty,
a party who intentionally or negligently fails to preserve relevant information may be
held accountable for the loss of such evidence.” Offshore Pipelines, Inc. v. Schooley,
984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.); see Wal-Mart
Stores, Inc. v. Johnson, 106 S.W.3d 718, 722 (Tex. 2003) (“Before any failure to
produce material evidence may be viewed as discovery abuse, the opposing party
must establish that the non-producing party had a duty to preserve the evidence in
question. . . . Such a duty arises only when a party knows or reasonably should know
that there is a substantial chance that a claim will be filed and that evidence in its
possession or control will be material and relevant to that claim.”) (citations omitted). 
“As a general rule, a party’s failure to produce evidence within its control raises the
presumption that, if produced, [the evidence] would operate against him.” Schooley,
984 S.W.2d at 666. The affected party must move for sanctions or, depending on the
circumstances, request a spoliation presumption or instruction. Id. The trial court
must then determine
whether sanctions or a presumption is justified. In making this legal
inquiry, the court must consider: (1) whether the accused party had a
duty to preserve the evidence; (2) whether the accused party negligently
or intentionally spoliated evidence; and (3) whether the spoliation
prejudiced the other party’s ability to present its case or defense. In
making this latter determination, the court should look to a variety of
circumstances, including the relevancy of the missing evidence, the
harmful effect of the evidence, and the availability of other evidence to
take the place of the missing information. . . .
 
If the trial court determines that a duty to preserve evidence exists
and that there has been a breach of that duty, resulting in prejudice to the
other party, the court then must consider what remedy is warranted by
the circumstances of the case. In choosing an appropriate sanction or in
submitting a spoliation instruction to the jury, the court is accorded
broad discretion.

 Id.
 
          Appellants repeatedly requested that the trial court apply a spoliation inference
to support their burden for obtaining class certification. However, nowhere in their
appellate briefs do appellants refer to a ruling on their requests. Our review of the
record has not revealed any such ruling or any express consideration of the inquiries
that Schooley and other spoliation cases make relevant. Nor can we construe the trial
court’s denial of appellant’s motion to certify the class as an implicit ruling on
appellants’ spoliation request: the denial of certification without specifying grounds
can be equally consistent with either no ruling on the spoliation request, a ruling
granting the spoliation request,


 or a ruling denying the spoliation request. See Tex.
R. App. P. 33.1(a)(2) (to preserve complaint, requiring objecting party to obtain
implicit or express ruling or to object to refusal to rule). We cannot review a ruling
that we cannot ascertain, nor can we remand the cause for appellants to obtain or to
record that ruling belatedly.
          We overrule issue two.
B.      Failure to Review Appellants’ Sealed Documents
          In support of their class-certification motion, appellants filed under seal two
evidentiary volumes, which consisted of excerpts from NCL’s “medical letter
database.”


 In issue one, appellants argue that the trial court abused its discretion, or
that its certification ruling is not entitled to an abuse-of-discretion standard of review,
because it appeared that the trial court had not reviewed the sealed volumes before
ruling. Appellants argue that, at a minimum, the Code of Judicial Conduct required
such review here. See Tex. Code Jud. Conduct, Canons 1-2, reprinted in Tex.
Gov’t Code Ann., tit. 2, subtit. G app. B (Vernon 1998) (generally requiring judges
to uphold judiciary’s integrity and independence and to avoid appearance of
impropriety).
          Appellants claim on appeal that the sealed volumes were relevant to the class-certification elements of numerosity, typicality, commonality, and predominance. 
Before the trial court, however, appellants consistently represented that the sealed
volumes related only to numerosity.


 We thus review the trial court’s actions under
the assumption that the appendices related only to numerosity, which was how the
trial court was told to view them.
          In its written opposition to class certification, NCL argued, among other things,
that the classes were not clearly identifiable by objective criteria because of the broad
way that appellants had defined the mobility-impaired class. In support, NCL argued
that the sealed volumes included records of some passengers who were not mobility-impaired and others who were mobility-impaired in varying degrees. NCL then
argued that appellants had failed to show numerosity for similar reasons.
          During the certification hearing, appellants stated several times that they did
“not believe that there is a serious dispute” that the numerosity requirement was met
and that, except “for a few technical quibbles about class definition, NCL has not
seriously objected on the ground that the class is not numerous.” Implicitly
supporting appellants’ assertion that numerosity was uncontested was the fact that
NCL’s counsel never mentioned numerosity again when he spoke later in the hearing.
          In fact, the only uncertainty about numerosity expressed during the entire
hearing appears to have arisen when, to address NCL’s objections to the class
definition, appellants narrowed the definition of the mobility-impaired class. Even
then, however, appellants indicated that there was no serious question about
numerosity. For example, when the trial court asked whether the narrower definition
materially affected numerosity, appellants replied, “It should not be a problem, . . .
the vast majority of people . . . would be the ones who [fit the new definition].” 
Again, when the trial court asked whether “[i]t is important for this Court to have
information available to it in the [new] numerosity analysis,” appellants at first
responded that they did not think so because “the vast majority of the people and the
types of conditions and injuries . . . would show that they meet that category.” And
although appellants later stated that it would be important for the trial court to know
how many people fell under the new class definition, appellants immediately added
that numerosity was not in question because NCL’s own evidence showed that the
medical letter database captured only about half of the actual number of mobility-impaired passengers. Again, NCL said nothing about numerosity when it later spoke.
          Given appellants’ representations that numerosity was not seriously contested
“except for technical quibbles about class definition,” appellants’ then redefining the
class to address those quibbles, and the fact that NCL’s counsel never contested
numerosity at the hearing, it would not be surprising if the trial court did not review
the sealed volumes that it had been told related only to numerosity and if the court
instead took appellants’ word for the numbers appearing in those volumes. We
decline to hold that the trial court abused its discretion or acted improperly if it did
not review the sealed volumes under these circumstances.
          We overrule issue two.
Denial of Appellants’ Motion to Certify the Two Classes
          In issue three, appellants claim that the trial court abused its discretion in
denying their motion to certify the two classes. 
A.      The Law of Class Certification
          The appealed order was issued under former Texas Rule of Civil Procedure 42,
which, like the rule’s current version, governs class certification. See Tex. R. Civ.
P. 42, 553-554 S.W.2d (Tex. Cases) XXXV-XXXVIII (1977, amended 2003)
[hereinafter “former Tex. R. Civ. P. 42”].


 Under former rule 42, “[a]ll class actions
must satisfy four threshold requirements: (1) numerosity (‘the class is so numerous
that joinder of all members is impracticable’); (2) commonality (‘there are questions
of law or fact common to the class’); (3) typicality (‘the claims or defenses of the
representative parties are typical of the claims or defenses of the class’); and (4)
adequacy of representation (‘the representative parties will fairly and adequately
protect the interests of the class’).” Southwestern Refining Co. v. Bernal, 22 S.W.3d
425, 433 (Tex. 2000) (citing former rule 42). Additionally, at least one of the
subdivisions of former rule 42(b) must be met. Id. Appellants sought certification
under former rule 42(b)(4),


 which requires that common questions of law or fact
predominate over questions affecting only individual members and that class
treatment be “superior to other available methods for the fair and efficient
adjudication of the controversy.” Former Tex. R. Civ. P. 42(b)(4); accord Bernal, 22
S.W.3d at 433. 
          No automatic right exists to maintain a lawsuit as a class action. Bernal, 22
S.W.3d at 439 (quoting Sun Coast Res. v. Cooper, 967 S.W.2d 525, 529 (Tex.
App.—Houston [1st Dist.] 1998, pet. dism’d w.o.j.)). Both former and current rule
42 provide that a trial court may certify the class if the plaintiff satisfies the rule’s
prerequisites. See id. (quoting Sun Coast Res., 967 S.W.2d at 529). Courts must take
a cautious approach to class certification and must perform a rigorous analysis to
determine whether all certification prerequisites have been met. Bernal, 22 S.W.3d
at 435; accord Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 690 (Tex. 2002)
(quoting Bernal). “Compliance with Rule 42 must be demonstrated; it cannot merely
be presumed.” Henry Schein, Inc., 102 S.W.3d at 691. The Supreme Court has
expressly rejected the approach of “certify now and worry later.” Bernal, 22 S.W.3d
at 435; accord Henry Schein, Inc., 102 S.W.3d at 690 (quoting Bernal). The
plaintiffs bear the burden of showing their entitlement to certification. See Sun Coast
Res. v. Cooper, 967 S.W.2d 525, 529 (Tex. App.—Houston [1st Dist.] 1998, pet.
dism’d w.o.j.); Glassell v. Ellis, 956 S.W.2d 676, 682 (Tex. App.—Texarkana 1997,
pet. dism’d w.o.j.); see also Henry Schein, Inc., 102 S.W.3d at 694 (“The question the
court must decide before certifying a class, after rigorous analysis and not merely a
lick and a prayer, is whether the plaintiffs have demonstrated that they can meet their
burden of proof in such a way that common issues predominate over individual
ones.”) (emphasis added).
B.      The Standard of Review
          We review the trial court’s class-certification ruling for abuse of discretion. 
See Henry Schein, Inc., 102 S.W.3d at 691. A trial court abuses its discretion only
if the record (1) clearly shows that the trial court misapplied the law to the established
facts, (2) does not reasonably support the ruling, or (3) shows that the trial court acted
arbitrarily or unreasonably. Sun Coast Res., 967 S.W.2d at 529.
C.      Predominance
          “[Former] Rule 42(b)(4)’s predominance requirement . . . is one of the most
stringent prerequisites to class certification.” Bernal, 22 S.W.3d at 433. “Courts
determine if common issues predominate by identifying the substantive issues of the
case that will control the outcome of the litigation, assessing which issues will
predominate, and determining if the predominating issues are, in fact, those common
to the class. The test for predominance is not whether common issues outnumber
uncommon issues but . . . ‘whether common or individual issues will be the object of
most of the efforts of the litigants and the court.’ If, after common issues are
resolved, presenting and resolving individual issues is likely to be an overwhelming
or unmanageable task for a single jury, then common issues do not predominate. 
Ideally, ‘a judgment in favor of the class members should decisively settle the entire
controversy, and all that should remain is for other members of the class to file proof
of their claim.’” Id. at 434. 
          The causes of action determine the substantive issues that will predominate in
this suit. See id. We thus examine predominance in light of each cause of action on
which appellants sought certification.
          1.       Violations of the DTPA
          To prevail under the DTPA, a plaintiff must show the following things:
●the plaintiff was a consumer;
●the defendant committed, among other things, (1) a “laundry-list”
violation under section 17.46(b)


 on which the plaintiff
detrimentally relied or (2) any unconscionable action or course of
action; and
 
●the wrongful act was a producing cause of the plaintiff’s
economic or mental-anguish damages.

See Tex. Bus. & Com. Code Ann. § 17.50(a) (Vernon 2002). 
          Appellants’ class-certification pleadings listed the following DTPA issues as
common to the classes:
●whether NCL made actionable misrepresentations in its
“company-wide publications and representations about the
accessibility of” cruises, ports of call, and excursions;
 
●whether NCL made actionable misrepresentations in its
“company-wide policies and representations concerning its travel
services, information and assistance”; and 
 
●whether NCL’s “policies, procedures, actions, or omissions”
constituted unconscionable conduct.



          Appellants argued that individual issues would not predominate because the
alleged misrepresentations were found in “virtually identical language in [NCL’s]
publications and documents” and arose from “NCL’s failure to inform [appellants]
about the lack of access to vessel facilities, ports and shore excursions.” Appellants
alleged that the statements in these materials violated the DTPA because they
constituted both laundry-list violations


 and unconscionable conduct.



          Appellants rely heavily on representations made in NCL’s national marketing
materials, which they claim were made to all class members. However, there was
evidence that NCL advertised through brochures, flyers, postcards, posters, and
“minibrochures” and that it ran advertisements in magazines, in travel-agency trade
journals, on television, and on the radio. In past years, NCL had sometimes issued
in a given year as many as five or six different brochures, organized by destination,
and 25 different flyers, organized topically. Advertising materials were sometimes
sent to potential customers upon request and, at other times, to travel agents. Travel
agents sometimes gave customers information about NCL’s cruises or vessels. 
NCL’s reservation department would also frequently answer questions. Additionally,
NCL presented evidence that it offered passenger courtesy coordinators to mobility-impaired passengers who contacted NCL (that is, to only some of its mobility-impaired passengers) and that these coordinators booked rooms and answered
questions regarding accessibility. NCL also maintained a website.
          As might be expected, given the varied ways in which NCL advertised and
responded to potential customers’ questions, there was evidence that appellants
received the representations on which they based their claims in different ways,
including orally. Julia Hollenbeck testified that NCL representatives verbally told her
that assistance on and off the ship would be available and that certain land tours
would be accessible and would offer assistance. Some of these representations
contradicted representations in NCL’s written materials, which she had also read. 
Appellant Rodger Peters testified that his travel agent, in response to his specific
questions, made oral representations that the shore excursions and certain ship areas
were accessible; that he also reviewed NCL’s brochures, a booklet with ship floor
plans, and the NCL website; and that he took a second cruise on a different NCL
vessel because of his travel agent’s assurances and NCL’s written materials and
website. Appellant Douglas Spector testified that the representations made to him
about accessibility on the ship were contained in NCL’s brochures and on its website
and were verbally made by its representatives and by his travel agent. Appellant
David Killough testified that he had read NCL’s brochures before purchasing his
ticket. Given the varying means of communicating and receiving representations, the
trial court could reasonably have concluded that determining what representations
were made to which class members would involve individual inquiries that would
predominate over common ones.
          Additionally, to the extent that appellants asserted laundry-list DTPA claims,
class members would also have to show detrimental reliance. See Tex. Bus. & Com.
Code Ann. § 17.50(a)(1)(A)-(B) (Vernon 2002) (expressly requiring detrimental
reliance for these violations); Henry Schein, 102 S.W.3d at 686.


 For the same
reasons and based on the same evidence as noted above, the trial court could have
reasonably determined that individual reliance inquiries would predominate over
common ones for appellants’ laundry-list DTPA claims. See Henry Schein, 102
S.W.3d at 693-94.



          2.       Breach of Contract
          The elements of a breach-of-contract action are (1) the existence of a valid
contract; (2) performance or tendered performance by the plaintiff; (3) breach of the
contract by the defendant; and (4) damages sustained by the plaintiff as a result of the
breach. Valero Mktg. & Supply Co. v. Kalama Int’l, L.L.C., 51 S.W.3d 345, 351 (Tex.
App.—Houston [1st Dist.] 2001, no pet.). A valid contract, in turn, requires (1) an
offer, (2) an acceptance, (3) a meeting of the minds, (4) each party’s consent to the
terms, and (5) execution and delivery of the contract with the intent that it be mutual
and binding. Wal-Mart Stores, Inc. v. Lopez, 93 S.W.3d 548, 555-56 (Tex.
App.—Houston [14th Dist.] 2002, no pet.).
          As the basis for their contract claims, appellants generally relied on the same
oral and written statements that they claimed violated the DTPA. Accordingly, for
appellants, the contractual terms were partially oral and based on answers to
individual questions. The same could be true for potential class members, especially
given appellants’ own experiences, NCL’s use of passenger courtesy coordinators,
and NCL’s reservation department’s oral responses to customer inquiries.
          “In determining the existence of an oral contract, the court looks to the
communications between the parties and to the acts and circumstances surrounding
those communications.” Prime Prods., Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631,
636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Looking to individual
communications to determine contract terms (and thus also breach) could require
individual inquiries to the extent that oral representations might have formed some
or all of a class member’s contract with NCL—as appellants testified that such
representations had for them. See Lopez, 93 S.W.3d at 555-57 (reversing order
certifying class in part because alleged oral contracts, made by different
representatives of defendant, and with terms that varied from those in written
materials, would involve individual issues on breach, contract terms, and apparent
authority to vary written terms, which individual issues would predominate over
common issues). Additionally, given the varied written materials that NCL used, and
the fact that even some appellants viewed different written materials, the trial court
would have acted within its discretion if it determined that the written contractual
terms might vary for each potential class member. Accordingly, as it could have with
the DTPA causes of action, the trial court could also reasonably have concluded that
individual inquiries as to contract terms and breach would require individualized
inquiries that would predominate over common ones.
          3.       Unjust Enrichment
          Unjust enrichment is not an independent cause of action. Amoco Production
Co. v. Smith, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ.). Rather, it
is “based upon the equitable principle that a person receiving benefits which were
unjust for him to retain ought to make restitution. . . . A right of recovery under
unjust enrichment is essentially equitable . . . .” Bransom v. Standard Hardware,
Inc., 874 S.W.2d 919, 927 (Tex. App.—Fort Worth 1994, writ denied). A party is
unjustly enriched when it receives benefits under circumstances that give rise to an
implied or quasi-contractual obligation to return the benefits. See id. Typically, “[a]
party may recover under the unjust enrichment theory when one person has obtained
a benefit from another by fraud, duress, or the taking of an undue advantage.” 
Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992).
          In alleging that NCL was unjustly enriched, appellants pleaded that the
following acts supported disgorgement of the sums that they had paid NCL and the
establishment of constructive trusts for those sums:
The actions and/or omissions of . . . NCL . . . caused Doug and Ana
Spector and Julia Hollenbeck to . . . purchase NCL cruises, services and
excursions which were not equally accessible to persons with mobility
impairments. Furthermore, NCL’s inaccessibility and refusal to make
reasonable accommodations without charge forced the Plaintiffs to pay
additional amounts to obtain accommodations and/or to choose between
participating in NCL programs, excursions and services which were
inaccessible or refraining from those activities in order to be with their
loved ones with mobility impairments. Additionally, the actions and/or
omissions of . . . NCL resulted in Rodger Peters not receiving the value
of the cruise that he purchased or compensation for the losses he
sustained as a result of their fraudulent conduct and the discriminatory
conduct that he was forced to endure. Furthermore, the actions and/or
omissions of NCL in 2000 resulted in Rodger Peters’ purchase of
another NCL cruise, services and/or excursions which were not equally
accessible to persons with mobility impairments at an inflated price.

(Emphasis added.) The allegations generally encompassed reliance on the part of
appellants or wrongful conduct by NCL, and the italicized portions implicated the
same actions or representations—both oral and written—that appellants alleged for
their DTPA and contract-breach claims. Indeed, in their brief’s discussion of
commonality and predominance, appellants assert that all of their claims—including
recovery under the theory of unjust enrichment—arise from similar actions and
representations, including language in NCL’s publications and tickets, NCL’s failure
to inform appellants that various facilities and excursions were inaccessible, and
NCL’s sale of cruises on which mobility-impaired passengers could not access
facilities and excursions. The trial court could thus have reasonably concluded that,
for the reasons set out above in our DTPA and breach-of-contract discussions, many
of the unjust-enrichment allegations would require individual inquiries that could
predominate over common ones.
          4.       Violation of Chapter 121
          Human Resources Code section 121.003 prohibits discrimination and provides:
 
(a)Persons with disabilities have the same right as the
able-bodied to the full use and enjoyment of any public facility


 in the
state.
 
(b)No . . . boat, or other public conveyance or mode of
transportation operating within the state may refuse to accept as a
passenger a person with a disability solely because of the person’s
disability, nor may a person with a disability be required to pay an
additional fare because of his or her use of . . . [a] wheelchair, crutches,
or other device used to assist a person with a disability in travel.

 
. . . .
 
(d)The discrimination prohibited by this section includes a
refusal to allow a person with a disability to use or be admitted to any
public facility, a ruse or subterfuge calculated to prevent or discourage
a person with a disability from using or being admitted to a public
facility, and a failure to:
 
(1)comply with [former] Article 9102, Revised Statutes;
 
                    (2)make reasonable accommodations in policies, practices,
and procedures; or
 
(3)provide auxiliary aids and services necessary to allow the
full use and enjoyment of the public facility.
Tex. Hum. Res. Code Ann. § 121.003 (Vernon 2001). The parties dispute whether
chapter 121 can apply to foreign-flagged vessels that sail in Texas waters.
          Appellants appear to have relied on sections 121.003(b) and (d)(1) through
(d)(3) as the bases for NCL’s liability to the class. Subsection (d)(1) incorporates
former Revised Civil Statute article 9102, the Architectural Barriers Act (“the ABA”),
which is now codified in Government Code chapter 469. See Tex. Gov’t Code Ann.
§§ 469.001-.208 (Vernon Supp. 2004) (adopted by Act of May 20, 2003, 78th Leg.,
R.S., ch. 1276, § 9.005(a), 2003 Tex. Gen. Laws 4158, 4203-09 and codifying,
effective September 1, 2003, former Texas Revised Civil Statute article 9201).


 The
ABA is intended “to ensure that each building and facility subject to this chapter is
accessible to and functional for persons with disabilities without causing the loss of
function, space, or facilities.” Id. § 469.001(a). The ABA charges the Texas
Commission of Licensing and Regulation with adopting various architectural
standards, specifications, and rules, which are published at Title 16, chapter 68 of the
Texas Administrative Code. See id. § 469.052; 16 Tex. Admin. Code ch. 68 (West
2003). Administrative Code Title 16, chapter 68 adopts the Texas Accessibility
Standards for, among other things, “buildings” and “facilities,” which chapter 68
defines as structures “located in the State of Texas.” 16 Tex. Admin. Code §§
68.10(2), (10), 68.20(a) (West 2003) (emphasis added). Predictably, the parties also
dispute whether the Texas Accessibility Standards apply to NCL’s vessels that sailed
in Texas waters.
          We need not decide whether chapter 121 or the Texas Accessibility Standards
that chapter 121 incorporates through the ABA apply to NCL’s vessels that sailed in
Texas waters.


 Assuming without deciding that the statute and standards could apply
to vessels sailing within Texas waters, we hold that the trial court did not abuse its
discretion if it concluded that appellants nonetheless did not show that common
issues under chapter 121 would predominate over individual issues.
          Even under appellants’ construction, chapter 121 and the Texas Accessibility
Standards could not apply to NCL’s vessels that never sailed in Texas waters. See
Tex. Hum. Res. Code Ann. § 121.003(a), (b) (providing for “full use and enjoyment
of any public facility in the state” and providing that mode of transportation
“operating within the state” may not commit certain discriminatory acts) (emphasis
added); 16 Tex. Admin. Code §§ 68.10(2), (10), 68.20(a) (adopting standards for,
among other things, “buildings” and “facilities,” which are defined as structures
“located in the State of Texas.”) (emphasis added); see also Tex. Hum. Res. Code
Ann. § 121.001 (Vernon 2001) (“The public policy of the state is to encourage and
enable persons with disabilities to participate fully in the social and economic life of
the state, . . . and to otherwise fully enjoy and use all public facilities available within
the state.”) (emphasis added).
          The majority of NCL’s vessels did not sail in Texas waters. NCL presented the
following evidence at the November 2001 class-certification hearing concerning its
vessels and their routes. One of the two vessels on which appellants sailed—the
NORWEGIAN STAR—sailed out of Houston, Texas from May 1997 to November
1998. The other vessel on which appellants sailed—the NORWEGIAN SEA—sailed
from Houston, Texas from December 1998 to January 2001. These were the only two
NCL vessels that sailed out of Texas. However, from August 1996 to November
2001, NCL operated 12 different cruise vessels, each sailing under the flag of the
Bahamas or Panama. At the time that appellants filed their lawsuit in 2000, NCL
operated six cruise vessels: the NORWEGIAN SEA, the NORWEGIAN SKY, the
NORWEGIAN DREAM, the NORWEGIAN WIND, the NORWEGIAN MAJESTY,
and the S/S NORWAY.


 NCL began operating a seventh cruiser, the NORWEGIAN
SUN, in September 2001. From August 1996 until November 2001, NCL vessels
sailed in the waters of the United States, Europe, Asia, Australia, and South America. 
Although appellants presented evidence that 90 or 98 percent of NCL’s passengers
come from or sail out of United States ports, NCL presented evidence that its vessels
that called in United States ports visited cities on the East Coast, the West Coast, the
Alaskan Coast, the Gulf Coast (but only from 1997 to 2001), and the Hawaiian
Islands. Appellants’ evidence showed that two vessels, the S/S NORWAY and the
NORWEGIAN DREAM, sailed out of Florida ports for at least some time included
within the period defined by the classes.
          The classes that appellants proposed included mobility-impaired passengers
and their companions who “lived in, or sailed from, Texas and who sailed on NCL
cruises from August 1, 1996 to present.” (Emphasis added.) The italicized portions
of the definitions were broad enough to include Texas residents who sailed on vessels
that never entered Texas waters. In fact, appellants’ own exhibits revealed that, of
239 entries from NCL’s medical letter database that concerned potential class
members and their companions who were Texas residents, 69 entries concerned
individuals (potential members alone or those members and their companions) who
sailed on one of the eight NCL vessels that sailed entirely outside Texas waters.


 
NCL’s evidence indicated that those eight vessels could have visited United States
cities on either the East Coast, the West Coast, the Alaskan Coast, or the Hawaiian
Islands.
          Appellants thus proposed class definitions that encompassed a potentially
significant number of members who could not, as a matter of law, have asserted
discrimination claims under Texas’s chapter 121 because they sailed on vessels that
never entered Texas waters. Appellants did not assert claims under the federal
Americans with Disabilities Act,


 and they did not explain below what other states’
anti-discrimination laws might have been implicated, whether and how those other
states’ anti-discrimination laws could apply to NCL’s vessels, or whether those states’
anti-discrimination laws were similar to Texas’s chapter 121.


 Appellants failed to
make this showing despite NCL’s assertion below (and again on appeal) that choice-of-law issues, including those applicable to appellants’ discrimination claims,
precluded class certification.


 Appellants’ trial plan similarly focused on proving
discrimination under chapter 121 alone. As the Texas Supreme Court has noted,
“State and federal courts have overwhelmingly rejected class certification when
multiple states’ laws must be applied” because predominance can thereby be defeated. 
Henry Schein, Inc., 102 S.W.3d at 698-99; accord Tracker Marine, L.P. v. Ogle, 108
S.W.3d 349, 359 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Here, appellants
failed to show the trial court that multiple states’ laws would not apply or that, if
multiple states’ laws did apply, those laws did not differ materially.
          Appellants responded below, as they do on appeal, that NCL had the burden
to show whether other states’ anti-discrimination laws differed from those of Texas. 
We disagree. In Henry Schein, Inc., the Texas Supreme Court placed the burden of
showing that “legal issued predominate[d]” on the plaintiffs seeking class
certification. See id., 102 S.W.3d at 697-98. The trial court in Henry Schein, Inc., in
certifying classes without having applied the proper choice-of-law analysis, had
erroneously concluded that all of the plaintiffs’ claims were governed by Texas law. 
See id. at 698. In holding that the plaintiffs had not carried their burden of showing
that legal issues would predominate, the supreme court reasoned as follows:
[The defendant] offered evidence of the differences in the law of other
states, but we do not have the benefit of an analysis of those differences
by the lower courts. Accordingly, we are not prepared to say that Texas
law will not govern any of the class members’ other claims besides those
for breach of licensing agreements with choice-of-law provisions. We
can say, however, that the plaintiffs have wholly failed to demonstrate
that Texas law should apply to so many of those claims that common
legal issues predominate.
 
. . .
 
The plaintiffs do not argue that a nationwide class should be certified if
the trial court must look to the laws of all fifty states to adjudicate the
claims. State and federal courts have overwhelmingly rejected class
certification when multiple states’ laws must be applied. For this
reason, the plaintiffs have failed to show that legal issues predominate.

Id. at 697, 698-99 (emphasis added; footnotes omitted). The court thus effectively
placed the burden on the plaintiff to show the absence of conflicting state laws when
a multi-state class is involved. 
          Several courts of appeals have followed Henry Schein, Inc. in placing this
burden on the class proponent. See Daimlerchrysler Corp. v. Inman, 121 S.W.3d
862, 886 (Tex. App.—Corpus Christi 2003, pet. filed);


 Ogle, 108 S.W.3d at 352;



see also Philadelphia Am. Appellant Life Ins. Co. v. Turner, No. 02-03-165-CV, 2004
WL 393155 at * 11 (Tex. App.—Fort Worth Mar. 4, 2004, no pet. h.) (citing Ogle
and holding that “[a]ppellee [plaintiff] had the burden of presenting an analysis of
state law evaluating any differences between the states enumerated in the class
definition and failed to satisfy that burden.”).


 We agree with these courts’
interpretation of Henry Schein, Inc. and note that that interpretation comports with
the plaintiff’s general burden to show its entitlement to class certification. See Sun
Coast Res., 967 S.W.2d at 529 (noting that plaintiff, as class-certification proponent,
has this burden); Ogle, 108 S.W.3d at 351-52 (“The class representatives bear the
burden of establishing the prerequisites for class treatment, so they must present an
extensive analysis of state law evaluating any differences.”).
 
          Appellants rely on Microsoft Corp. v. Manning to support their position that
the class-certification opponent (here, NCL) bears the burden of showing that
differing laws defeat predominance. See id., 914 S.W.2d 602, 613 (Tex.
App.—Texarkana 1995, writ dism’d). Manning does not control. First, it predated
Henry Schein, Inc., in which the Supreme Court placed the burden of establishing the
appropriate law, for purposes of predominance, on the proponent of nationwide
classes. Second, the Texas state-court decision on which the Manning court relied
for this holding was Weatherly v. Deloitte & Touche, 905 S.W.2d 642, 650 (Tex.
App.—Houston [14th Dist.] 1995, no writ.), the pertinent holdings of which the
Fourteenth Court of Appeals has since expressly or impliedly abandoned. See Ogle,
108 S.W.3d at 352 (overruling Weatherly to extent that Weatherly allowed
postponement of choice-of-law questions until after certification and also holding,
contrary to Weatherly, that class representatives bear burden of presenting analysis
of differing states’ laws). Third, the Manning court bolstered its conclusion by
reasoning that, if the trial court later found that other states’ laws applied or that those
laws destroyed commonality or predominance, the court could create subclasses or
simply decertify the class. Manning, 914 S.W.2d at 613. The Texas Supreme Court
has since rejected such a certify-now-and-worry-later approach to class certification. 
See Bernal, 22 S.W.3d at 435; accord Henry Schein, Inc., 102 S.W.3d at 690 (quoting
Bernal); see also Ogle, 108 S.W.3d at 352 & 352 n.9 (noting that Weatherly court’s
holding that trial court could postpone choice-of-law determinations until after
certification was type of certify-now-and-worry-later approach rejected by Bernal).
          Accordingly, we hold that the trial court did not abuse its discretion in refusing
to certify the chapter 121 claims, given the class definitions, the evidence, and the
fact that appellants did not explain what law applied to class members who sailed
solely outside Texas waters or whether the applicable laws differed materially.
D.      Conclusion
          We hold that the trial court did not abuse its discretion in denying appellants’
motion to certify either proposed class. Accordingly, we overrule issue three.
Conclusion
          We affirm the trial court’s order denying class certification.
 
 
Tim Taft
Justice


Panel consists of Justices Taft, Higley, and Price.