**Pedro AGUIAR and Maria Aguiar, Appellants,**

v.

**Paul SEGAL and Geoffrey Abadee, Appellees.**

No. 14–04–00389–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 24, 2005.

Rehearing Overruled Aug. 4, 2005.

J. Michael Fieglein, Galveston, TX, for appellants.

Kenneth J. Bower, Ervin A. Apffel Jr., Galveston, TX, for appellees.

Panel consists of Justices YATES, ANDERSON, and HUDSON.

## MAJORITY OPINION

JOHN S. ANDERSON, Justice.

This is a breach of contract case. Pedro and Maria Aguiar, the sellers, appeal the trial court's judgment awarding the appellees, the buyers, specific performance of five earnest money contracts for the sale of five parcels of real property. The sellers raise three issues on appeal, arguing: (1) there is no evidence or factually insufficient evidence to support the trial court's findings of fact numbers 6, 7, 8, 11, 13, 15, 16, 18, 19, and 20; (2) the trial court's conclusions of law numbers 1, 3, 4, and 5 are erroneous; and (3) the evidence shows the buyers, not the sellers, breached the five earnest money contracts by failing to close the five sales within the time prescribed by the earnest money contracts, and the sellers are entitled to recover on their counterclaim for the earnest money paid under the five contracts and their attorney's fees. We reverse and remand.

## BACKGROUND

In May 2003, the sellers, Pedro and Maria Aguiar, and the buyers, California residents Paul Segal and Geoffrey Abadee,

entered into five earnest money contracts for the sale of four apartment complexes and one residential duplex located in Galveston County, Texas. The buyers agreed to pay the sellers $1,140,000.00 for the five properties. Pursuant to the terms of the five contracts, the buyers deposited the required amount of earnest money for each contract with Stewart Title Company, the escrow agent. The following list identifies the five properties to be sold, each property's respective sale price, and the amount of earnest money deposited:

| Property | Sale Price | Earnest Money |
|---|---|---|
| 1. 1704 & 1706 Ave. L | $ 280,000.00 | $ 5,000.00 |
| 2. 6919 Ave. O | $ 65,000.00 | $ 500.00 |
| 3. 1010 63rd Street | $ 160,000.00 | $ 1,000.00 |
| 4. 2719 Ave. P | $ 150,000.00 | $ 1,000.00 |
| 5. 1602 Texas Ave. | $ 485,000.00 | $ 5,000.00 |
| **Total** | **$ 1,140,000.00** | **$12,500.00** |

Each of the contracts specify "time is of the essence" and contain integration clauses. The integration clauses generally provide that the contract contains the entire agreement of the parties and may not be changed except in writing. Both parties agree there is no other written agreement by the parties that purports to change any provision of the earnest money contracts. The contracts also contain the following provision governing the remedies available to the buyers and sellers in the event of a default by the other party:

15. DEFAULT:

A. If Buyer fails to comply with this contract, Buyer is in default and Seller may:

(1) terminate this contract and receive the earnest money as liquidated damages, thereby releasing the parties from this contract; or

(2) enforce specific performance, or seek other relief as may be provided by law, or both.

B. If, without fault, Seller is unable within the time allowed to deliver the estoppel certificates or the commitment, Buyer may:

(1) terminate this contract and receive the earnest money, less any independent consideration under paragraph 7B(3)(a), as the sole remedy; or

(2) extend the time for performance up to 15 days and the closing will be extended as necessary.

C. Except as provided in Paragraph 15B, if Seller fails to comply with this contract, Seller is in default and Buyer may:

(1) terminate this contract and receive the earnest money, less any independent consideration under Paragraph 7B(3)(a), as liquidated damages, thereby releasing the parties from this contract; or

(2) enforce specific performance, or seek such other relief as may be provided by law, or both.

Additionally, paragraph 9(A) of the contracts provides, "If either party fails to close by the closing date, the non-defaulting party may exercise the remedies in Paragraph 15." The contracts also allow the prevailing party in a suit brought relating to the contracts to recover reasonable attorney's fees.

Under each contract, the original date for closing was July 15, 2003. A financing addendum to the contracts provided for an automatic fifteen-day extension of the closing date in the event the buyers' lender had not completed the lender's closing requirements, such as an appraisal, by the

closing date. On July 15, 2003, the appraisals of the five properties were not complete, and the closing date was automatically extended under the contract for fifteen days, until July 30, 2003.

On July 30, 2003, the appraisals still were incomplete. The buyers' lender, Moody National Bank, would not fund the buyers' loans until the appraisals of the properties were complete. The closing date was extended by an oral agreement, but the parties disagree as to the duration of the orally agreed extension. When the properties did not close a week later on August 6, 2003, the sellers terminated the contracts, and the parties never closed the earnest money contracts. The trial court found Moody National Bank was prepared to fund the loans by August 25, 2003, and the buyers currently have a loan commitment for the purchase of the real properties.

The buyers filed this suit against the sellers seeking specific performance of the contracts based on the sellers' alleged breach of the five contracts, and asserted claims of fraud, promissory estoppel, partial performance, declaratory judgment, waiver, and attorney's fees against the sellers. The sellers filed a counterclaim against the buyers alleging the buyers breached the earnest money contracts by failing to timely close the contracts, and seeking recovery of the earnest money and their attorney's fees under the contracts together with post-judgment interest.

After a one-day bench trial, the trial court ruled in favor of the buyers, awarding them specific performance of the five earnest money contracts and $37,500.00 in attorney's fees. The trial court issued findings of fact and conclusions of law, and the evidentiary support for such findings and conclusions is at the core of this appeal.

## DISCUSSION

In their first issue, the sellers challenge the following findings of fact by the trial court:

6. [The sellers] never objected or complained about any delay in obtaining the loan commitment.

7. [The sellers] never requested that the contract be terminated for failure to timely obtain financing and never returned the earnest money to [the buyers].

8. [The sellers] elected by their silence, conduct and words to treat the contracts as continuing and [the buyers] relied on that election to their detriment.

11. On or before July 30, 2003, Pedro Aguiar expressly agreed to extend the date of the closing. [Mr. Aguiar]'s behavior after July 30, 2003 was consistent with an extension of time for the closing. After July 30, 2003, [Mr. Aguiar] circulated a letter to his tenants stating that the properties were being sold. Further appraisals of the real estate were scheduled with the full knowledge and participation of the [the sellers] as follows:

| Date | Property |
| --- | --- |
| July 31, 2003 | 2719 Avenue P |
| July 31, 2003 | 1602 Texas Avenue |
| August 5, 2003 | 1010 63rd Street |

13. On August 6, 2003, [the sellers] informed [the buyers] for the first time that [the sellers] were no longer willing to complete the sale of the property.

15. At all relevant times, [the buyers] were ready, willing and able to perform their obligations under the contracts including payment of the purchase price in cash, if necessary.

16. The [buyers] have fulfilled all of their obligations under the earnest money contracts, and all occurrences

and conditions precedent to the [buyers'] right to have [the sellers] perform have been satisfied.

18. Because of [the sellers'] breach of contract, [the buyers] are entitled to recover specific performance of the contracts from [the sellers].

19. [The buyers] are entitled to reasonable attorney's fees in the amount of $37,500.00 pursuant to the contracts between [the buyers] and [the sellers].

20. [The sellers] are liable for breach of contract and [the buyers] are entitled to recover:

 a. specific performance to enforce all five (5) contracts for the sale of the real estate;

 b. reasonable attorney's fees in the amount of $37,500.00;

 c. post-judgment interest at the rate of ten (10) percent per annum (or the highest rate allowed by law), from the date of judgment until paid; and

 d. costs of court.

In their second issue, the sellers challenge the following conclusions of law:

1. [The buyers] met all statutory and common-law requirements for recovery of attorney's fees.

3. [The sellers] waived any right to terminate the contract based on delays in securing financing.

4. The July 30, 2003 closing date was waived by the parties and the parties could have closed by August 25, 2003 which is a reasonable time for performance under the circumstances.

5. [The sellers] are liable for breach of contract and [the buyers] are entitled to recover:

 a. specific performance to enforce all five (5) contracts for the sale of the real estate;

 b. reasonable attorney's fees in the amount of $37,500.00;

 c. post-judgment interest at the rate of ten (10) percent per annum (or the highest rate allowed by law), from the date of judgment until paid; and

 d. costs of court.

In their third and final issue, the sellers claim they are entitled to recover on their counterclaim for earnest money, attorney's fee's and post-judgment interest.

## I. The Trial Court's Findings of Fact and Conclusions of Law

In issue one, the sellers argue the trial court erred in its findings of facts because there is no evidence or factually insufficient evidence to support findings of fact numbers 6, 7, 8, 11, 13, 15, 16, 18, 19, and 20. Specifically, the sellers assert the evidence conclusively established the following:

(1) the sellers timely objected to the delay in financing and the buyers' delay in closing (challenging finding of fact number 6);

(2) the sellers informed the buyers of their intent to terminate the contracts based on the buyers' failure to timely close the sales pursuant to the contracts (challenging finding of fact number 7);

(3) the sellers never by silence, words, action, or inaction elected to treat the contracts as continuing (challenging finding of fact number 8);

(4) the sellers agreed to extend the date for closing the sales for only one week and no more (challenging finding of fact number 11);

(5) the sellers timely notified the buyers of their intent to terminate the contracts due to the buyers' failure to timely close the sales, and the sellers

terminated the contracts based on the buyers' failure to timely close the sales pursuant to the agreements with the buyers (challenging finding of fact number 13);

(6) the buyers did not fulfill or satisfy all conditions precedent under the contract to obtaining specific performance and did not tender performance within the time set for closing of the sales (challenging finding of fact number 16);

(7) the sellers did not breach their contracts with the buyers, thus specific performance was not available to the buyers (challenging finding of fact number 18);

(8) because there was no breach of contract by the sellers, the buyers were not entitled to recover attorney's fees (challenging finding of fact number 19); and

(9) the sellers were not liable for breach of contract (challenging finding of fact number 20).

In issue two, the sellers specifically contend the trial court erred in its conclusions of law numbers 1, 3, 4, and 5 as follows: (1) because there was no breach of contract by the sellers, the buyers did not establish they met all statutory and common-law requirements for the recovery of attorney's fees; (2) the sellers did not waive any right to terminate the contracts based upon the buyers' delays in securing financing; (3) the sellers agreed to extend the closing past July 30, 2003, for one week only, until August 6, 2003, and performance by the buyers was required within that period of time, a week, and not "a reasonable time" after July 30, 2003; and (4) because the sellers did not breach the earnest money contracts, the buyers are entitled to no relief.

**A. Standard of Review**

Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon jury questions. *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex. Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.). When challenged on appeal, the findings are not conclusive if there is a complete reporter's record, as there is here. *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.-Houston [14th Dist.] 2002, no pet.). The trial court's findings will not be disturbed if there is evidence of probative force to support them. *Id.*

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). If an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal there is no evidence to support the adverse finding. *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). In reviewing a "no evidence" point, we consider all the evidence in the light most favorable to the trial court's finding, indulging every reasonable inference in favor of the prevailing party, and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Price Pfister, Inc.*, 48 S.W.3d at 347. If more than a scintilla of evidence exists to support the finding, the no evidence challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

When an appellant attacks the factual sufficiency of an adverse finding on an issue which he did not have the burden of proof, the appellant must demonstrate the evidence to support the finding is so weak that the finding is clearly wrong and manifestly unjust. *Price Pfister, Inc.,* 48 S.W.3d at 347. In a factual sufficiency challenge, all of the evidence in the record, both for and against the finding, is reviewed. *Id.*

We review the trial court's conclusions of law de novo. *Smith v. Smith,* 22 S.W.3d 140, 143–44 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Under de novo review, the reviewing court exercises its own judgment and redetermines each legal issue. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex.1998). We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow,* 932 S.W.2d 627, 631 (Tex.App.-Houston [14th Dist.] 1996, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

Here, the trial court filed twenty findings of fact and five conclusions of law in support of its judgment. In addition, the record contains a reporter's record of the proceedings.

### B. Breach of Contract

In its findings of fact and conclusions of law, the trial court essentially found the sellers never objected to or complained about any delays in obtaining the loan commitment, never requested that the contract be terminated on this basis, and elected by their silence, conduct, and words to treat the contracts as continuing. Based on these findings, the trial court determined (1) the sellers waived any right to terminate the contracts based on the buyers' delays in securing financing, and

(2) the sellers breached the contracts by terminating the contracts.

The sellers contend the trial court's findings and conclusions are erroneous. The sellers' complaints focus on what transpired on July 30, 2003 and thereafter concerning the five contracts. The sellers claim the evidence shows that on July 30, 2003, Mr. Aguiar orally agreed to a one-week extension of the contracts. When the contracts did not close a week later on August 6, 2003, Mr. Aguiar terminated the contracts due to the buyers' failure to close on or before the closing date. The sellers contend the buyers' failure to close the five loans on August 6, 2003 constituted a breach of the earnest money contracts, and the buyers' breach entitled the sellers to terminate the earnest money contracts. It is undisputed the earnest money contracts failed to close on August 6 because the buyers' lender failed to fund the loans on that date due to incomplete appraisals.

The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Specific performance of a contract to sell real estate will not be decreed if the plaintiff seeking specific performance has himself committed a material breach of contract. *See Scott v. Vandor,* 671 S.W.2d 79, 84 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). The issue of whether a party breached a contract is a question of law. *Garza v. Southland Corp.,* 836 S.W.2d 214, 219 (Tex.App.-Houston [14th Dist.] 1992, no writ).

 Parties to a written contract may orally agree to extend the time of performance of a contract required to be in writing, so long as the oral agreement is made before the expiration of the written contract. *Dracopoulas v. Rachal,* 411 S.W.2d 719, 721 (Tex.1967). If time is of the essence by express stipulation in a contract, strict performance may be waived by the party entitled to insist on it. *Carpet Servs. Inc., v. George A. Fuller Co. of Texas,* 802 S.W.2d 343, 346 (Tex.App.-Dallas 1990), *aff'd,* 823 S.W.2d 603 (Tex.1992). Such waiver may be written or oral, and it may be shown by circumstances or course of dealing. *Id.* Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Continental Casing Corp. v. Siderca Corp.,* 38 S.W.3d 782, 789 (Tex. App.-Houston [14th Dist.] 2001, no pet.). The affirmative defense of waiver can be established by a party's express renunciation of a known right, or by silence or inaction for so long a period as to show an intention to yield the known right. Because waiver is largely a matter of intent, for implied waiver to be found through a party's actions, intent clearly must be demonstrated by the surrounding facts and circumstances. *Id.*

## C. The Evidence

 Keeping the above principles in mind, we review the record to determine whether the evidence is legally and factually sufficient to support the trial court's findings of fact and conclusions of law. The following is a summary of the relevant testimony regarding what transpired between the parties on July 30, 2003, the end of the contractual automatic extension date, and thereafter.

A real estate agent, Rebecca Habeb, acted as an intermediary for both parties under the terms of the earnest money contracts. According to Ms. Habeb, she called Mr. Aguiar on July 30, 2003, the last day to close the sales under the fifteen-day extension in the contracts, and she told Mr. Aguiar the properties were not going to close that day. Mr. Aguiar told her he was worried about his tenants because the tenants were refusing to pay rent and were moving out. Mr. Aguiar told her the tenants had heard the property was going to be sold, and he had lost about ten thousand dollars. Ms. Habeb assured Mr. Aguiar the verbal appraisals were coming in one by one. She explained the lender would not fund the full loan without the written appraisals, and the four larger properties had lengthy appraisals that would take a couple of more weeks to finalize after the verbal appraisal was received. Mr. Aguiar again told her he was worried about his tenants. She asked him what he wanted her to do, and he said he did not know. She offered to write a letter to his tenants explaining the buildings are going to be sold but the rents would not be raised and nobody would be kicked out of their apartment to assist Mr. Aguiar in getting his rents from the tenants. He agreed to have her write the letter.

Ms. Habeb also testified Mr. Aguiar orally agreed during the July 30 phone call to extend the closing date beyond July 30. She reminded Mr. Aguiar three more appraisals were coming up, two the following day, July 31, and one on August 5. Mr. Aguiar told her he knew that. She asked him if "we were going forward," and he said yes. She asked him if he was sure he was okay with this, and he said yes. Ms. Habeb asked Mr. Aguiar if he could hold out for one more week because that is when the bank said it could *start* the closings. Mr. Aguiar verbally agreed to a one-week extension, but he did not agree to any time beyond a week. Ms. Habeb testified that she did not tell him all five

properties would close within a week because only the bank knew how long it would take to close.

A week later on August 6, 2003, the sales neither closed nor "started" to close. That day, Mr. Aguiar called Ms. Habeb and told her he wanted to terminate the contracts. He told her he had been having problems with his tenants, he was afraid the sale was not going to go through, and the bank was taking too long. Ms. Habeb still believed the sale was going to go through. When he called to terminate, she tried to talk him out of it and told him the bank was almost ready to close. He told her he was worried about his tenants, he was losing money, and he had heard "the bank [had not] really confirmed the sales" and "around Galveston the properties were selling for more money."

On August 6, the sellers executed "releases of earnest money and contract" for four of the properties.[1] The following day, on August 7, 2003, Ms. Habeb faxed the four releases of earnest money and contract to the buyers. As to the fifth property, the residential duplex, the sellers gave the buyers notice of cancellation of that contract on August 14, 2003. Ms. Habeb testified the sellers' cancellations of the earnest money contracts were inconsistent with what Mr. Aguiar had told her on July 30 about wanting to go through with the sale.

Paul Segal, one of the buyers, testified the funds were not ready for closing on July 30, 2003. He testified no consideration was given to Mr. Aguiar to extend the closing date, and there was no written agreement concerning any extension. However, according to Mr. Segal, he and his partner, Mr. Abadee, were ready to pay cash for the five properties on July 30 and August 5. When asked whether he thought he had an oral agreement with Mr. Aguiar to extend the time for closing on or about July 15 and July 30 and thereafter, Mr. Segal answered yes. Mr. Segal did not testify as to any specifics concerning the alleged oral agreement.

Mr. Aguiar testified he was ready to close the contracts on July 15 and July 30, but the sales of the properties did not close on these days. On July 30, Ms. Habeb asked him to give her one more week to close the contracts, and he agreed to give her one week from July 30. Mr. Aguiar testified he was desperate because she had promised him the contracts would close all along, yet the contracts still had not closed. A week later, on August 6, the sales still had not closed, so he decided to cancel the contracts. Prior to August 6, Mr. Aguiar had never refused to sell the properties to the buyers. He stated he never received any money or promises to extend the closing date prescribed by the earnest money contracts, and there are no written agreements varying the terms of the contracts.[2]

According to Mr. Aguiar, on July 30, he only agreed to extend the closing date for one week. Ms. Habeb told him on July 30 that one or two properties could be closed that day, and by waiting one more week,

---

1. A "release of earnest money and contract" is a termination of the earnest money contract and release of earnest money from the title company back to either the buyer or the seller. The buyers did not sign the releases.

2. The issue of whether there was consideration for the oral extension by the parties of the closing date in the contracts was not raised in the trial court or on appeal. An agreement for extension of time for performance of a contract should be supported by separate and distinct consideration. *See Walden v. Affiliated Computer Servs. Inc.*, 97 S.W.3d 303, 314 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Stevenson v. Adams*, 640 S.W.2d 681, 684 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.).

four of the properties would close August 6. Ms. Habeb told him all of the properties could be closed within a week, and she did not tell him the properties could *start* closing within a week.

At trial, Steve Hughes, the real estate appraiser who appraised the five properties, testified regarding the appraisals, and Kent Dodge, a loan officer with Moody National Bank, testified regarding the loan documents and the need to have the appraisals of the properties completed before the bank could fund the loans. Their testimony does not bear on the issue of whether the parties agreed to extend the contract beyond August 6 or whether the sellers waived their right to terminate the contract.

**D. Sufficiency of the Trial Court's Findings and Conclusions**

Utilizing the sufficiency standards set forth above, we look first to the trial court's findings of fact. Considering only the evidence and reasonable inferences in support of the court's findings, we conclude the trial court's findings of fact numbers 6, 7, 8, 16, 18, 19, and 20 are not supported by any evidence. In addition, reviewing all of the evidence in the record, we conclude the evidence to support these findings is so weak that the findings are clearly wrong and manifestly unjust. We reach these conclusions based on the following evidence:

- Ms. Habeb testified she asked Mr. Aguiar on July 30, 2003 to hold out for one more week, and he agreed to do so.
- Ms. Habeb testified she asked Mr. Aguiar to hold out for one more week because the bank was supposed to start closing on the properties within a week.
- Mr. Aguiar testified he agreed to a one-week extension of the closing for the earnest money contracts, but it

was his understanding that all five properties would close within a week.

- Mr. Aguiar assisted with the scheduling of the appraisals of the properties within the one-week extension and he notified his tenants that a sale was imminent, attempting to facilitate the scheduled closing of the five contracts by August 6, 2003.
- The buyers' lender was not able to close on August 6 and, in fact, the lender was not prepared to fund the loans until August 25, 2003, almost three weeks later.
- Mr. Aguiar informed Ms. Habeb on August 6 that he was terminating the contracts, and he executed the releases.
- The contracts provided time was of the essence.

Of utmost importance is the fact that Ms. Habeb's and Mr. Aguiar's testimony that the earnest money contracts were orally extended for only one week until August 6 so that closing of the properties at some level would begin by August 6 is not controverted. Ms. Habeb and Mr. Aguiar's testimony concerning the oral agreement to extend the closing of the contracts until August 6, 2003 directly contradicts the trial court's findings of fact numbers six, seven, and eight that the sellers *"never* objected or complained about any delay in obtaining the loan commitment," *"never* requested that the contract be terminated for failure to timely obtain financing ...," and "elected by their silence, conduct and words to treat the contracts as continuing...." (Emphasis added). The evidence does not support these three findings. In fact, the record shows Mr. Aguiar expressed his concerns to Ms. Habeb regarding the buyers' delay in closing the loans on July 30, 2003 and again on August 6, 2003. On August 6, Mr. Aguiar told Ms.

Habeb he was terminating the contracts, and he executed the releases of earnest money and contracts for four of the properties. Ms. Habeb then faxed the executed releases to the buyers the following day, August 7, and the release for the fifth property was executed August 14, 2003.[3] None of the properties closed or began to close on August 6, and it was not until the end of August that the appraisals were complete and the bank was ready to close the five properties.

The evidence conclusively established the sellers orally agreed to a one-week extension of the contract, from July 30 through August 6, and, on August 6, the *buyers* did not close or begin to close the earnest money contracts. Thus, there is no evidence to support the trial court's findings of fact numbers 16, 18, 19, and 20 that the buyers fulfilled all of their obligations under the earnest money contracts and all occurrences and conditions precedent to have the sellers perform have been satisfied; the sellers' breach of contract entitles the buyers to specific performance of the contracts; and the buyers are entitled to reasonable attorney's fees.

■ . Having determined the evidence is legally and factually insufficient to support the trial court's findings of fact numbers 6, 7, 8, 16, 18, 19, and 20, we next review the trial court's conclusions of law. Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.-Austin 1992, no writ). The trial court concluded in conclusions of law one, three, four, and five that the sellers met all statutory and common-law requirements for recovery of attorney's fees; "waived any right to terminate the contract based on delays in securing financing;" waived the July 30, 2003 closing date and could have closed by August 25, 2003, "a reasonable time for performance under the circumstances;" and are liable to the sellers for breach of contract and attorney's fees.[4]

---

3. The buyers have not asserted on appeal that this release and the property it covered executed over one week after the four other releases should be treated any differently than, or had any effect on, the other properties.

4. Focusing on Mr. Aguiar's conduct in preparing the estoppel certificates on July 31 and allowing the appraisals of the properties to be conducted on July 31 and August 5, the dissent would defer to the trial court's finding of fact number eight that the sellers "elected by their silence, conduct and words to treat the contracts as continuing and [the buyers] relied on that election to their detriment" and would affirm the trial court's judgment based on theories of waiver and estoppel.

Mr. Aguiar was bound under the terms of the earnest money contracts to prepare the estoppel certificates for the properties and to facilitate the appraisals of the properties; otherwise, the sellers would be in default and liable to the buyers for breach. Thus, Mr. Aguiar's conduct in fulfilling these two contractual duties on July 31 and August 5, during the orally agreed to *one-week extension* for closing, is not evidence of waiver by the sellers of their right to terminate the contracts and does not estop the sellers from terminating the contracts when the sales did not close at any level on August 6, the agreed upon extended closing deadline. The record simply does not support the trial court's finding that the sellers elected by their silence, conduct, and words to treat the contracts as continuing, thereby allowing the buyers to rely on that election to their detriment.

Focusing on principles of equity, the dissent states Mr. Aguiar "indicated by his conduct that he would permit *a reasonable time* to obtain the written appraisals." (Emphasis added). The evidence shows Mr. Aguiar orally agreed to a *one-week extension* of the contracts, *not* to a reasonable time, and his conduct was consistent with the orally-agreed-to one-week extension. The dissent implies the parties' orally-agreed-to one-week-extension somehow transformed into a "reasonable" extension of time for the sellers to close the contracts; this simply is not born out by the record. Equitable principles of waiver and estoppel simply do no come into play under

Based on the trial court's legally and factually insufficient findings discussed above, we conclude these conclusions of law are not supported by any evidence, and we hold these conclusions of law are erroneous as a matter of law. The evidence is insufficient to support the trial court's conclusions that the sellers waived their right to terminate the contracts and that the sellers breached the contracts.

Based on the foregoing, the buyers were not entitled to prevail on their breach of contract claim against the sellers or to recover attorney's fees.

We sustain the sellers' first and second issues.

## II. The Sellers' Counterclaim

In their third issue, the sellers argue that because the buyers failed to close the five earnest money contracts by paying the purchase price to them by the extended August 6, 2003 closing date, the sellers were entitled to declare the contracts terminated and retain the earnest money pursuant to paragraph 15(A)(1) of the contracts. In addition, the sellers assert they are entitled to recover their attorney's fees, pursuant to paragraph sixteen of the contracts, in the amounts of $7,500.00 for trial and $12,000.00 for the appeal.

### A. Earnest Money

the facts of this case, and the evidence is legally and factually insufficient to support a finding by the trial court of waiver or estoppel in favor of the buyers.

**5.** In finding of fact number four, the trial court found the total amount of earnest money deposited in the escrow account was $12,500.00. The sellers do not specifically challenge this finding of fact on appeal, but in their brief, the sellers assert the amount of earnest money deposited was $ *13,* 500.00 and seek to recover this amount under their counterclaim. During trial, the sellers introduced into evidence (1) a copy of the title company's escrow receipt showing

■ Parties to a contract may stipulate the amount of damages to be recovered in the event of a breach. *See Birdwell v. Ferrell,* 746 S.W.2d 338, 341 (Tex.App.-Austin 1988, no writ). Such an agreement binds the parties and furnishes the measure of damages. *See id.* at 341–42.

■ Paragraph nine of the earnest money contracts, entitled "Closing," provides if either the buyer or seller fails to close by the closing date, the non-defaulting party may exercise the remedies in paragraph fifteen. Paragraph 15(A)(1) of the contracts sets forth the remedies the seller may pursue in the event of the buyer's default:

15. DEFAULT

A. If Buyer fails to comply with this contract, Buyer is in default and Seller may:

(1) *terminate this contract and receive the earnest money as liquidated damages, thereby releasing the parties from this contract;* or

(2) enforce specific performance, or seek other relief as may be provided by law, or both.

(emphasis added). The trial court found a total of $12,500.00 in earnest money was deposited by the buyers in the escrow accounts for the five properties.[5]

$13,500.00 was deposited into the escrow account, and (2) a copy of a check written by Paul Segal to the title company for $13,500.00. However, according to the earnest money contracts, the sum total of the earnest money required to be deposited by the sellers in accordance with the five contracts was $12,500.00. Even if we liberally construe the sellers' arguments as challenging the legal and factual sufficiency of the trial court's finding of fact number four, because there is record evidence to support the $12,-500.00 amount found by the trial court, the finding is legally and factually sufficient, and we are bound by this finding. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986)

■ The uncontradicted evidence shows the buyers failed to close within the time agreed upon for closing. The buyers' failure to close by the closing date constituted a breach of the earnest money contracts. As the non-defaulting party, the sellers were entitled under the contracts to exercise the remedies provided by paragraphs nine and fifteen. In accordance with these provisions, the sellers terminated the contracts and seek recovery of the earnest money as liquidated damages.

We conclude the sellers established they are entitled to recover $12,500.00 in earnest money from the buyers, and the trial court erred in failing to award the sellers this amount. *See Harrison v. Gemdrill Int'l Inc.,* 981 S.W.2d 714, 718 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (reversing and rendering judgment on defendant's counterclaim for breach of contract for lost wages). Having decided the sellers were entitled to recover the earnest money under the contract, we next determine whether the sellers adequately proved their right to recover attorney's fees under the contract.

### B. Attorney's Fees

■ The sellers claim the trial court should have awarded them $19,500.00 in attorney's fees under the contract. We agree.

Paragraph sixteen of the contracts governs the sellers' recovery of attorney's fees, providing, "If … Seller … is a prevailing party in any legal proceeding brought under or with relation to this contract or this transaction, such party is entitled to recover from the non-prevailing parties all costs of such proceeding and reasonable attorney's fees. This Paragraph 16 survives termination of this contract."

■ The earnest money contracts provide clear contractual justification for an award of attorney's fees to the prevailing party in this action. *See Emery Air Freight Corp. v. General Transport Sys., Inc.,* 933 S.W.2d 312, 315–16 (Tex.App.-Houston [14th Dist.] 1996, no writ) (holding parties' agreement provided clear contractual justification for the award of costs and expenses, including attorney's fees, to the prevailing party). For the trial court to award an amount of attorney's fees as a matter of law, "the evidence from an interested witness must not be contradicted by any other witness or attendant circumstances and the same must be clear, direct and positive, and free from contradiction, inaccuracies and circumstances tending to case [sic] suspicion thereon." *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990); *see Harrison,* 981 S.W.2d at 719. The trial court, "as a trier of fact, may award attorneys' fees as a matter of law in such circumstances, especially when the opposing party has the means and opportunity of disproving the testimony or evidence and fails to do so." *Ragsdale,* 801 S.W.2d at 882.

As the prevailing party, the sellers are entitled to recover reasonable attorney's fees under paragraph sixteen of the contracts. The sellers' attorney testified the sum of $7,500.00 was a reasonable and necessary attorney's fee for trial of the case, and in the event of a successful appeal, the sum of $12,000.00 was a reasonable and necessary attorney's fee in connection with the appeal. The buyers did not object to the amount of the requested attorney's fees, contest the reasonableness of the fees, or offer any evidence to contradict such an amount. Accordingly, attor-

---

(holding unchallenged findings of fact are binding on an appellate court unless the con-

trary is established as a matter of law or there is no evidence to support the finding).

ney's fees in the amount of $19,500.00 are warranted.

We sustain the sellers' third issue.

## CONCLUSION

Having sustained the sellers' first, second, and third issues, we reverse the judgment of the trial court. We remand the case to the trial court for entry of a new judgment consistent with this opinion, including a finding of the total amount of post-judgment interest calculated pursuant to applicable law.

YATES, J., concurs in the result only without a separate opinion.

HUDSON, J., dissents and files a dissenting opinion.

J. HARVEY HUDSON, Justice, dissenting.

I do not agree with the majority's conclusion that the trial court's findings of fact are unsupported by the record. I must, therefore, respectfully dissent.

As the trier of fact in a bench trial, the trial judge determines the credibility of the witnesses and the weight to be given their testimony, decides whether to believe or disbelieve all or any part of the testimo-

ny, and resolves any inconsistencies in the testimony. *Tagle v. Galvan*, 155 S.W.3d 510, 518 (Tex.App.-San Antonio 2004, no pet.). He may, therefore, draw reasonable inferences from the evidence, and his findings may not be disregarded if the record contains some evidence of probative value from which those inferences may be drawn. *Peter v. Ogden Ground Servs., Inc.*, 915 S.W.2d 648, 650 (Tex.App.-Houston [14th Dist.] 1996, no writ). Accordingly, we must review the evidence in the light most favorable to the trial court's findings.

The earnest money contracts at issue here were executed on May 12, 2003. As sellers, the Aguiars agreed to sell five properties containing approximately 80 apartment units on or before a closing date of July 15, 2003. Although the buyers, Segal and Abadee, had access to the $1,140,000.00 needed to make a cash purchase of the five properties, they chose instead to apply for a loan from Moody National Bank. In fact, the earnest money contracts contain customary recitations making them contingent on the availability of third party financing.[1] After reviewing the financial status of the buyers, including tax returns and personal financial state-

---

1. The contract for the property located at 2719 Avenue P., for example, states:

 A. *THIRD PARTY FINANCING:*
 (1) The contract is contingent upon Buyer obtaining a third party loan secured by the Property in the amount of $120,000 for not less than 20 years with the initial interest rate not to exceed 6½ % per annum.
 (2) Not later that 7 days after the effective date of the contract. Buyer must apply for the third party loan described in Paragraph A(1). Buyer must make every reasonable effort to obtain the loan. Buyer has obtained the loan when the lender has determined that Buyer has satisfied all of lender's financial requirements (those items relating to net worth, income, and creditworthiness). If the

 loan is not obtained within 30 days after the effective date, the contract will terminate and the earnest money, less any independent consideration under Paragraph 7B(3)(a) of the contract, will be returned to Buyer.
 (3) Each note to be executed under this addendum is to be secured by vendor's and deed of trust liens.
 (4) If the loan is obtained within the time required under Paragraph A(2) but Buyer's lender has not completed lender's closing requirements (for example, survey, insurance, repairs, closing documents, appraisal), the closing date will be extended up to 15 days only if necessary to complete lender's closing requirements.

ments, the bank approved a loan of up to 70% of the value of the properties. On July 9, 2003, the bank issued loan commitments to the buyers contingent upon the receipt of favorable appraisals of the properties. However, on July 15, 2003, the scheduled closing date, the appraisals were not yet complete.[2] Because the buyers were still waiting on financing, both parties continued under the assumption that the express terms of the contract extended the closing date to July 30, 2003.[3]

On July 30, 2003, Pedro Aguiar spoke to Rebecca Habeb, his realtor, and expressed his concern regarding the delayed closing because many of his tenants apparently stopped paying rent once they realized he was a lame duck landlord. Habeb explained to Aguiar that verbal appraisals were coming in one by one on the various properties, but that the bank could not make a full loan without written appraisals.[4] Nevertheless, with the receipt of each verbal appraisal, the bank immediately began finalizing the loan documents for that particular transaction even in advance of receiving the written appraisal. Habeb asked Aguiar if he could wait another week to *start* the closings.[5] Aguiar said he could wait another week.[6] Habeb asked

---

2. In fact, the loan commitments were not formally accepted and agreed to by the buyers until July 21, 2003.

3. *See supra* note 1 (subparagraph A(4)).

4. The record suggests that two verbal appraisals had been obtained by July 30, 2003.

5. Rebecca Habeb testified on redirect examination:

 Q Who can do it in one more week?
 A No. If Pedro [Aguiar] can hold out for one more week to start the closings.
 Q To start the closings?
 A Right.
 Q But not to close entirely?
 A No. To start the closings.
 Q As a matter of fact that's what your memo says, isn't it?
 A Right.
 Q It says eight lines down, could he hold out for one more week. Do you see that?
 A Yes.
 Q Parentheses, which is when the bank says they can start closing. You even put the word start closing in there, didn't you?
 A Correct.
 Q So you did not represent to Pedro [Aguiar] that this deal could be closed in one week, did you?
 A No.
Further, Segal testified that he was prepared to conduct individual closings on each of the five properties as the documents were completed, but Aguiar insisted on waiting until all five properties could be closed simultaneously.

6. Rebecca Habeb testified on redirect examination:

 Q Did you ever tell [Aguiar] that all five properties would close within one week?
 A No.
 Q And he knew they could not close within one week because three properties had not yet been appraised?
 MR. FIEGLEIN: Objection, leading. Calls for speculation.
 THE COURT: Sustained.
 Q Did he know that three of the properties could not close because they had not yet been appraised?
 MR. FIEGLEIN: Objection, Your Honor. Calls for speculation. No predicate.
 THE COURT: Rephrase it.
 Q You heard Mr. Fieglein ask you on cross examination if Mr. Aguiar was aware of the fact that the property had to be appraised, do you remember that?
 A Yes.
 Q And you answered that he was aware of it?
 A Yes.
 Q And was he also aware of the fact before the bank would lend the money the property had to be appraised?
 A Yes.
 Q If he was aware of that and three parcels of property had not yet been appraised was he therefore aware of the fact that the bank was not ready to lend the money on those three parcels until they had been appraised?
 MR. FIEGLEIN: Objection. Calls for speculation.

Aguiar if he still wanted to go forward with the sale. Aguiar said he still wanted to go forward with the sale. Habeb reminded Aguiar that two appraisal inspections were scheduled for July 31, 2003, and another inspection was scheduled for August 5, 2003. Habeb further explained to Aguiar that because at least four of the written appraisals would each be a hundred pages in length, the written appraisals could not be completed until a couple of weeks after the verbal appraisals.[7] Habeb asked Aguiar if he still wanted to go forward. Aguiar said he did.

In preparation for the closing, Aguiar prepared estoppel certificates for the tenants of four of his properties with a cover letter announcing to each tenant that "[y]our building is in the process of being sold." Each tenant also received a certificate certifying the commencement date of his/her individual lease, the date of the next rent payment, current terms of the lease, the amount of his/her deposit, the date of expiration of his/her lease, whether he/she had an option to renew, etc. Delivery of these certificates to the tenants began on July 31, 2003.

Although the last apartment appraisal inspection was conducted on August 5, 2003 (in Aguiar's presence and with his assistance), Aguiar terminated the earnest money contracts the following day on August 6, 2003.[8] One reason given to Habeb for the termination was that Galveston properties were selling for more money than the price stipulated in the earnest money contracts. In fact, Segal testified that in September 2003, Aguiar told him the apartments were worth $5,000 more per unit than they had originally agreed upon. Segal said Aguiar offered to go forward with the sale if he would agree to increase the sale price another $400,000. Segal refused.

If, as here, the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex.2004) (per curiam). However, contractual rights can be waived. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 722 (Tex. App.-Dallas 2004, no pet.). A waiver occurs when a party either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 57 (Tex.1998). A party's silence or inaction for a period of time long enough to show an intention to yield the

THE COURT: Overruled.

A He was aware, yes.

Q And then it says that I asked him directly if he wanted to extend and he said yes. You asked him if he wanted to extend what?

A The time to closing.

Q. On the five parcels of property?

A Right. The properties, he wouldn't sell one. It was all five or that was the agreement when the price was set for all five properties.

Q If he wanted to continue with the sale of the property he knew that the three appraisals would have to be accomplished first, did he not?

A Yes.

Q And it would therefore take more than one week, is that correct?

A Yes.

Q Now, did you ever tell him how long it would take to close the sale on these properties after the appraisal?

A No. I was guessing two to three weeks. I had no idea. The bank wasn't talking to me. They were talking to Paul Segal.

7. One written appraisal was completed on July 23, 2003; three were completed on August 15, 2003; and another was completed on August 27, 2003.

8. The bank was ready for closing on all five properties on August 24, 2003.

known right is also enough to prove a waiver. *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex.1996).

Moreover, where a promissee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, the promisor's promise is binding if injustice can be avoided only by enforcement of the promise. *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex.1965). Thus, estoppel arises where one party has been induced to change his position for the worse because of the conduct of another party. *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex.1967). The doctrine of estoppel can be invoked where the conduct of one of the parties has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if he were afterwards allowed to disavow his conduct. *Johnson*, 148 S.W.3d at 721. Here, Aguiar said he wanted to continue with the transaction although he was not legally obliged to do so. Moreover, he indicated by his conduct that he would permit a reasonable time to obtain the written appraisals. In reliance thereon the record indicates the buyers expended $11,400 in appraisal fees, $7,525 in loan fees, $1,739 in survey fees, $2,850 in inspection fees, $257 in tax certificates, and $20,250 for the services of a property manager.

Accordingly, I would defer to the trial court's finding that the Aguiars "elected by their silence, conduct and words to treat the contracts as continuing and Plaintiffs relied on that election to their detriment." Because I would affirm the trial court's judgment, I must respectfully dissent.