

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-20-00082-CV

---

**IEA RENEWABLE ENERGY, INC., APPELLANT**

**V.**

**PERMIAN BASIN MATERIALS LLC D/B/A PB MATERIALS HOLDINGS, INC.,
APPELLEE**

---

On Appeal from the 237th District Court
Lubbock County, Texas
Trial Court No. 2018-530,583, Honorable Les Hatch, Presiding

---

February 2, 2021

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Wind turbines and concrete are the foundation of this appeal. IEA Renewable Energy Inc. (IEA) builds the former and Permian Basin Materials LLC (PB) pours the latter. And, in furthering each other's business, IEA contracted with PB to pour the base and pedestal of a particular wind turbine as part of the General Electric (GE) Elsie Project. Part of PB's charge was to derive a concrete mix meeting certain strength and alkali-silica reaction (ASR) levels required by project engineers. Those levels differed between the base and pedestal. While PB had little difficulty deriving the requisite formula for the

base, the same was not true concerning the pedestal. Its initial formula met the strength requirement, but not the ASR. Nonetheless, IEA urged PB to continue its efforts to derive a satisfactory formula while knowing that the requisite ASR test period of 16 days would exceed previously designated pour dates. It also agreed to pay for the additional ASR testing costs to be incurred by PB and began work on developing its own formula satisfying the ASR parameters. The latter was done with the assistance of PaveTex, the entity PB used to conduct the tests. Apparently, PB gave IEA permission to contact PaveTex directly. And, in communicating with each other, IEA and PaveTex compiled a mix deemed acceptable. That mix consisted of the mix developed by PB but with the addition of 5% more fly ash. Indeed, the percentage of fly ash (20%) utilized mirrored that included in PB's formula for the 5,000 psi base, and IEA was so certain it would work, it opted not to submit the mix to ASR testing. PB too came upon a 6,500 psi mix tested to be sufficiently nonreactive ("innocuous" for purposes of ASR testing). Yet, IEA opted to use its own concoction and directed PB to pour it. PB complied, and the base and pedestal were poured.

PB sought payment for its work, and IEA responded by claiming breach of contract. The contractual defaults underlying the claim included PB's purported failure to abide by the originally scheduled pour date and to apprise IEA of the difficulties it encountered. The claims and counterclaims of the parties were submitted to a jury, which ultimately awarded PB recovery from IEA. The latter appealed and urged through its multiple issues that the evidence did not support the jury's verdict. We affirm.

As summarized by IEA: "[t]he jury found that both parties breached the contract, that IEA breached first, that PB's breach was excused, and that IEA's breach was not

excused. None of these findings are supported by legally or factually sufficient evidence."

The standards of review we utilize in addressing this argument are discussed in *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580 (Tex. 2016), and *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). Before applying them to address the issues, we make these preliminary observations.

First, the cause was submitted via oral argument. During same, the parties generally conceded that both breached their respective obligations in some way.[1] The main issue, therefore, devolves into who breached first.[2] Second, who breached first, though, is not necessarily dispositive for the jury found that the PB's failure to comply with the accord was "excused" while IEA's was not. Logically, then, if the jury's decision to excuse PB from its defaults has the support of legally and factually sufficient evidence, then it does not matter if PB breached first. This is so because there would only be one breach that could be the subject of recovery, and that would be IEA's. So, initially assessing whether the jury had sufficient evidence upon which to excuse the failures of PB may avoid extended exposition, and, consequently, we address that first.

The pertinent jury question and instruction submitted by the trial court read:

Was Defendant PB's failure to comply excused?

Failure to comply by Defendant PB is excused if compliance is waived by Plaintiff IEA.
Waiver is the intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

---

[1] The jury found that PB breached the agreement in failing to 1) "[p]rovide the concrete in accordance with the project schedule"; 2) "[i]mmediately notify Plaintiff IEA of any actual or potential delays"; and 3) "[a]dvise . . . IEA of measures being taken to avoid or reduce delays." So, too did it find that IEA breached the agreement but was not asked to specify the way the company did.

[2] According to the jury, IEA failed to "comply with the Agreement" first.

Failure to comply with an agreement is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement.

Failure to comply by Defendant PB is excused if the following circumstances occurred:

1. Plaintiff IEA

a. by words or conduct made a false representation or concealed material facts, and

b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

c. with the intention that Defendant PB would rely on the false representation or concealment in acting or deciding not to act; and

2. Defendant PB

a. did not know and had no means of knowing the real facts and

b. relied to its detriment on the false representation or concealment of material facts.

As can be seen from this, excuse had several aspects, those being waiver, acceptance of alternate performance, and estoppel. That said, we turn to the evidentiary record before us.

IEA formally placed its "order" for concrete to be used in the base and pedestal of the foundation on November 8, 2017, according to the initial purchase order (PO). The base was to withstand a "psi" (pound-force per square inch) of 5,000 psi while the pedestal was to withstand 6,500 psi. The PO also mentioned an "expected" date of performance as December 15, 2017. PB had a pre-existing mix or recipe for concrete meeting 5,000 psi. It did not have one meeting 6,500 psi, had to formulate it, and represented same to IEA. Its initial attempt began by the end of November and was submitted for testing.

4

The PO was revised by IEA and sent to PB on November 29th. It retained the "expected" delivery date of December 15th and also included, among other things, a project schedule. Per that schedule, the period within which preliminary items for the foundation (e.g., "conduit/grounding") would be procured ended as late as December 20th, while the "Foundation As Builts" date (or date for completion of the foundation) was January 18, 2018. The schedule said nothing of a specific date upon which the concrete for the foundation would be poured by PB. Nevertheless, IEA selected a December 22nd date, despite the December 15th "expected" date mentioned in the PO.

Again, PB's effort to formulate the necessary pedestal mix had begun before the revised PO was sent. According to a PB representative, trial batches for the 6,500 psi were prepared on November 27th and 28th. The ensuing tests mandated by the engineers controlling the project required a 28-day testing period. Within that period both strength and ASR testing were to be performed. Those tests began around December 4, 2017, and IEA knew of this. Given the need for such a lengthy testing period, the pour date was then moved by IEA to January 4, 2018, or 14 days before the January 18th "Foundation As Builts" date accompanying the modified PO.

The trial batches passed the applicable strength tests but not the ASR ones. PB discovered this around December 28th and told IEA. IEA relayed this information to the engineers the same day, via email, and solicited options. The engineers responded on the 29th, via email, with questions and proposals suggesting that a different class of fly ash be used in the mix or that fly ash be increased. On January 2, 2018, IEA replied to the December 29th email from the engineers and opined therein that the batch would have passed had the test been run "with the ash to mitigate." So too did IEA state that it

5

had PB "start a new test," which test would necessarily span a 28-day period, too. Also of record is an email from PB to IEA and the engineers stating that the next round of testing would begin on January 3, 2018, thanking them "for working with us," and acknowledging that the project was time sensitive. The same person sent another email dated January 2nd to the engineers and IEA "attach[ing] stamped submittals for the project," inviting questions, and concluding with, "[w]e look forward to working with you on the Elsie project."

On the 3rd of January, IEA solicited from PB "any older passing ASR results on similar or higher ash designs." PB was told in the email that IEA was "looking into a backup plan and thinking about increasing the ash in the current [PB] designs to help mitigate potential ASR fails." PB replied, via email also dated January 3th, that it would search "ASR testing on previous designs" and was "glad to help out as much as we can." Around this same time, PB communicated with IEA about the option of adding lithium to the mix which would remedy the ASR concern. IEA rejected that proposal.

Emails ensued from GE to other GE employees and IEA proposing, among other things, the delayed concrete pour date of January 15, 2018, depending on the outcome of the tests upon the mix PB submitted about ten days earlier. Furthermore, on January 5th, IEA sought an update from PB regarding "the backup mix designs we discussed yesterday with additional ash quantities." So too did it inquire about the new round of testing and stated that GE was "pushing hard on us and *we* need to show *we* have a backup plan in place." (Emphasis added).

Around January 14th, IEA received preliminary ASR test results conducted on PB's second mix. They suggested the potential for another failure, though the tests were not

6

complete. GE was told the same. This circumstance rendered the January 15th pour date infeasible. By that time, IEA also had received permission from PB to contact the testing entity (PaveTex) directly. IEA and PaveTex then collaborated to find a mix that satisfied the requisite ASR test; the engineers apparently joined in the collaboration. They began with the formula or mix developed by PB and simply increased the fly ash content. As the engineers wrote in an email dated January 24th, the PB 5,000 psi mix for the base had 20% fly ash and passed ASR testing. If the fly ash content of the 6,500 psi mix were increased to 20% as well, then the engineers would "accept the passing 5,000 psi design ASR tests for it automatically." That addition was made, along with an adjustment in the cement and water ratio. It resulted in the mix IEA had PB pour, even though it had not formally passed ASR when poured. Indeed, the supervising project engineers did not require the testing because IEA was able to use the ASR test on the 5,000 psi base mix developed by PB to satisfy the 6,500 psi pedestal mix requirements. As said by the IEA representative, the ASR test that passed on the 5,000 psi mix was used "also for the 6,500 mix if we updated the fly ash."

Additionally, during the period after the first batch of 6,500 psi failed ASR testing and PB endeavored to develop a sufficient formula, IEA not only directed PB to compile another batch but also agreed to pay the cost of testing it. It also said nothing about its belief that PB had somehow breached the agreement by failing to derive a formula to be used by any particular pour day. This is of import because PB sought direction from IEA about what the latter wanted to do. In the words of PB's representative, the company was trying to determine whether IEA cared to retain another business to provide the concrete at that time. Instead, IEA told PB to move forward with testing a new batch. PB

7

also evinced its willingness to help in any way it could, which included acceding to IEA's request to have aggregate from Amarillo delivered to PB's lot for use in a possible solution.

Evidence of record indicates that the new batch derived by PB returned with an "innocuous" ASR result by January 20th.[3] So, PB too had a mix available to use.[4] Yet, IEA opted to use the mix it developed with PaveTex, which mix was 99% of that developed by PB.

As mentioned earlier, the jury was charged on waiving compliance. The court defined it as the "intentional surrender of a known right or intentional conduct inconsistent with claiming the right." *See Enchilada's Nw., Inc. v. L&S Rental Props.*, 320 S.W.3d 359, 363 (Tex. App.—El Paso 2010, no pet.) (citing *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam), and defining waiver as the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right). Moreover, "[e]ven if time is of the essence by express stipulation in a contract, strict performance may be waived by the party entitled to insist on it. Such waiver may be written or oral, and it may be shown by circumstances or by course of dealing." *Carpet Servs., Inc. v. George A. Fuller Co. of Tex.*, 802 S.W.2d 343, 346 (Tex. App.—Dallas 1990), *aff'd*, 823 S.W.2d 603 (Tex. 1992); *accord Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App.—Houston [14th] 2005,

---

[3] "Innocuous" meant "nonreactive," and ASR testing gauged the reaction of materials in the concrete.

[4] IEA conceded in its appellate brief that "[o]n January 22, 2018, PB's mix finally received a passing ASR test result." It nonetheless suggested that the mix was unavailable for use because "it still did not have an engineer-stamped strength result." The absence of an "engineer-stamped strength result" could be viewed as inconsequential by a jury though, given that IEA did not submit its formula to any engineered stamped testing. Again, it opted to forgo ASR testing because the testing performed on PB's original 5,000 psi was deemed sufficient. Furthermore, evidence of record indicates that PB's 5,000 psi mix had an actual psi exceeding 7,000. That coupled with the fact that the 5,000 psi mix met ASR testing illustrates that PB and IEA had a formula sufficient to use on 6,500 psi pedestal all along.

pet. denied) (stating that even if time is of the essence by express stipulation in a contract, strict performance may be waived which may be shown by circumstances or course of dealing). The theory is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. *Enchilada's Nw.*, 320 S.W.3d at 363 (citing *Jernigan*, 111 S.W.3d at 156). It may result from one party's express or implied assent to the continued performance of the other party without objection to the delay. *See Coastal Javelina, Inc. v. Caldwell Mktg., Inc.*, No. 13-98-117-CV, 1999 Tex. App. LEXIS 6503, at *9 (Tex. App.—Corpus Christi Aug. 26, 1999, no pet.) (concluding that "there was some evidence that Coastal waived the requirement of strict compliance with the delivery schedule by accepting the late deliveries and working with JVS to get the orders filled"); *see also Carpet Servs., Inc.*, 802 S.W.2d at 346*; Laredo Hides Co. v. H & H Meat Prods. Co.*, 513 S.W.2d 210, 218 (Tex. Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.).[5]

We conclude that the jury had some evidence upon which it could rationally conclude that IEA waived compliance by PB with contractual terms regarding the derivation of a mix, maintaining communication, and timely performance. PB was obliged to compile base and pedestal mix designs which passed strength and ASR testing. Yet, the evidence indicated that the pour date was a moving target. The PO had a suggested date of December 15th, while the underlying build plans had one of January 18th. IEA then designated the pour for December 22nd only to change it to January 4th upon

---

[5] We acknowledge IEA's contention that the PO barred oral modifications of the agreement. Assuming waiver and modification are the same animal, we note that such clauses still do not *ipso facto* bar the parties from orally modifying the agreement. *See Aguiar,* 167 S.W.3d at 451 (stating that the parties to a written contract may orally agree to extend the time of performance of a contract required to be in writing, so long as the oral agreement is made before the expiration of the written contract). So, we find the contention inapposite.

realizing that the 28-day test period required for PB's first batch would render the 22nd infeasible. Upon discovering that the first batch failed ASR testing, PB communicated with IEA about what it wanted to do, which apparently included utilizing alternate concrete providers. In response, IEA said to create another batch and test it, knowing that such would again impact the pour date. It rejected suggested solutions offered by PB, agreed to pay for the additional tests, and asked PB for permission to use its lot as a storage location for rock. And though PB ultimately derived a pedestal formula that passed ASR testing no later than two days of the January 18th build date mentioned in the overall scheduling plans, IEA opted to use another formula virtually identical to PB's own. It then had PB pour both the foundation and pedestal without voicing to PB complaint about the delay. Such can be characterized by a jury as engaging in intentional conduct inconsistent with claiming a right or as accepting alternate performance by PB. Consequently, IEA did not carry its burden to show that no evidence appeared of record to support the finding of excuse.

Admittedly, the evidence was contradictory. Witnesses proffered by IEA testified favorably for IEA, while those of PB testified favorable for it. In a sense, the situation was one of "he said, she said," and the jury was free to select which he or she to believe. It obviously chose to believe PB's. The jury having that perogative and having evidence to support its decision, we cannot say its decision was against the great weight and preponderance of the evidence.

In short, the evidence is both legally and factually sufficient to support the jury's finding of excuse. Consequently, we need not address the remaining issues posed by IEA. Again, it matters not who breached first since that of PB was excused, and IEA was

not entitled to a judgment notwithstanding the verdict, which argument formed the substance of its third and final issue.

We affirm the judgment of the trial court.


Brian Quinn
Chief Justice