Opinion issued August 4, 2011.   

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00186-CV

———————————

Jim Rutherford and Linda Rutherford, Appellant

V.

CenterPoint
Energy Houston Electric, LLC, Appellee



 



 

On Appeal from the 240th Judicial District Court 

Fort Bend County, Texas



Trial Court Case No. 05-CV-144259

 



 

MEMORANDUM OPINION

          This
is a real property dispute concerning the scope of an express easement.  The holders of the servient estate, Jim and
Linda Rutherford, brought suit against the holder of the dominant estate, CenterPoint
Energy Houston Electric LLC, for trespass, breach of contract, negligence,
gross negligence, and injunctive relief after CenterPoint removed trees and other
vegetation from the easement on the Rutherfords’ property.  The case proceeded to a jury trial.   After the Rutherfords rested at trial, CenterPoint
moved for directed verdict on all claims. 
The trial court directed verdict in favor of CenterPoint and signed a
take-nothing judgment in its favor.  On
appeal, the Rutherfords contend that the trial court erred in granting CenterPoint’s
motion for directed verdict because they presented sufficient evidence to raise
a fact issue on their trespass, breach of contract, and negligence claims.  We affirm the judgment of the trial court.   

Background

Underlying Facts 

     In 1967, R.E. Smith conveyed to Houston Lighting and Power
Company “an unobstructed easement” for “electrical transmission and
distribution lines, consisting of variable numbers of lines, and all necessary
or desirable appurtenances.”  The
easement granted Houston Lighting the right: 

(1) of ingress and egress to or from said right-of-way for the purpose of
constructing, reconstructing, inspecting, patrolling, hanging new lines on,
maintaining and removing said line and appurtenances; (2) to remove from said
right-of-way and land adjacent thereto, all bushes, trees, and parts thereof,
or other obstructions, which, in the opinion of the Houston Lighting &
Power Company, endanger or may interfere with the efficiency, safety or proper
maintenance of said line or its appurtenances; and (3) of exercising all other
rights hereby granted.   

The
Rutherfords are the successors-in-interest to Smith, and CenterPoint is the
successor-in-interest to Houston Lighting.  In 2003, the Rutherfords purchased the property
with the easement.  At the time of their purchase,
they had knowledge of the easement.  The
Rutherfords’ property consists of a thirty-three-acre tract of land in
Thompson, Texas.  The Rutherfords’ home
is on the property.    

The easement
occupies ten acres of the thirty-three-acre property.  It is 200 feet wide and runs east to west
along the northern boundary of the Rutherfords’ property.  On the easement, there are four steel
towers.  Two of the towers hold up
transmission lines of 138 kilovolts (kV), while the other two towers hold up
transmission lines of 345 kV.  Transmission
lines are high voltage lines used to transport large amounts of power over long
mileages to hundreds of thousands of people. 
The 138 kV transmission lines are thirteen feet from the southern edge
of the easement, and the 345 kV transmission lines are twenty-four feet from
the northern edge of the easement.  The
lines are between twenty-nine to forty-five feet above the ground.  A line of trees separates the southern
boundary of the easement from the Rutherfords’ house.  Another line of trees separates the northern
boundary of the easement from the adjacent property.  The middle of the easement is empty of
vegetation.             

In 2005,
Trees, Inc., one of CenterPoint’s vegetation maintenance contractors, removed
all the indigenous trees that were in the easement from the northern tree
line.  The Rutherfords received no notice
from CenterPoint prior to the removal.  The
Rutherfords’ landscaper estimated that CenterPoint had removed 580 trees, and
the cost to replace the trees was $66,810. 
A tree line remained on the border of the adjacent property north of the
easement.  Trees, Inc. also trimmed
certain branches of those trees because they hung into the easement.  Kenneth Coleman was an account manager at
Trees, Inc. in 2005 and supervised the vegetation maintenance at the
easement.  He testified that CenterPoint
instructed him to remove any vegetation in the easement that was ten feet or
higher or that had the potential to grow ten feet or higher.  Based on his thirty-three years of
experience, he stated that most vegetation grows at least ten feet and that he
is capable of identifying a low-growing species.  To his knowledge, all the vegetation that was
removed from the easement was at least ten feet or had the potential to grow to
ten feet.  Another CenterPoint contractor
later returned to the easement to spray herbicide on the stumps of the removed
trees to prevent re-sprouting.  According
to CenterPoint, herbicide is an accepted means for removal of vegetation near
transmission lines.        

Michael
Pakeltis, a CenterPoint representative and manager in its transmission
operations department, testified that CenterPoint, as a general practice,
removes all trees that could grow ten feet or higher or that interfere with
access to its transmission lines.  CenterPoint
adopted this practice because transmission lines have high voltage and require
greater clearances from trees than street-side distribution lines require.  Pakeltis testified that, in CenterPoint’s
opinion, all the trees removed from the Rutherfords’ easement could potentially
interfere with the efficiency, safety, and maintenance of its transmission
lines on the property.  According to
Pakeltis, trees along the sides of the easement can impede restoration and
maintenance work on the transmission lines.  CenterPoint must position large trucks between
the outermost transmission line and the edge of the easement to safely complete
certain maintenance and restoration works, such as replacing the line’s
insulator or restoring power if a natural disaster like a hurricane or tornado
destroys a transmission tower. 
CenterPoint workers almost always work from the sides of the lines.  Pakeltis also stated that controlling the
trees at their youngest stage and removing them from the easement before they
become a problem is the most cost-efficient method to maintain the transmission
lines.  CenterPoint believes this
practice creates a more predictable and safer transmission corridor.                      

          Jim Rutherford testified that CenterPoint
treated the trees on his property differently than it treated trees on other
properties in the area.  He stated that
mature trees were underneath the transmission lines on the property northeast
of his property.  This property is known
as Edwards Cemetery.  CenterPoint has not
removed these trees.  CenterPoint responded
that it did not have the same type of easement on the cemetery property as the
one that it has on the Rutherfords’ property. 
It only has an aerial easement of forty feet above ground over Edwards
Cemetery.  As a result, CenterPoint
trimmed the tops of the trees in the cemetery at forty feet as opposed to
removing them.  Pakeltis testified these
were the best rights CenterPoint could obtain at the time for that particular
property.           

Proceedings in the Trial Court 

          In
2005, after CenterPoint had removed the trees from the easement on the
Rutherfords’ property, the Rutherfords filed suit, alleging trespass, breach of
contract, negligence, and gross negligence.  In addition, they sought temporary and
permanent injunctions prohibiting CenterPoint from further removing any
vegetation from the easement.  A jury
trial was conducted.  After the
Rutherfords rested, CenterPoint moved for a directed verdict on all claims against
it, asserting among other grounds that the easement expressly authorized its
removal of the trees on the property.  
The Rutherfords withdrew their request for injunctive relief, but argued
against the motion on the other claims. 
The trial court granted CenterPoint’s motion without specifying a reason
and signed a take-nothing judgment in favor of CenterPoint.  

Discussion

On appeal, the
Rutherfords contend that the trial court erred in granting a directed verdict
on their claims of trespass, breach of contract, and negligence.  The Rutherfords do not brief their trial
court claim for gross negligence. 
Without briefing on this claim, the trial court’s ruling on it stands.  Tex. R.
App. P. 38.1(i) (stating that brief “must contain a clear and concise
argument for the contentions made, with appropriate citations to authorities
and to the record.”); see Franz v. Katy
Indep. Sch. Dist., 35 S.W.3d 749, 755 (Tex. App.—Houston [1st Dist.] 2000,
no pet.).  Accordingly, we confine our
discussion to the Rutherfords’ trespass, breach of contract, and negligence
claims.   

Standard of Review 

We review a grant of a directed verdict
under a legal sufficiency analysis of the evidence.  City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  When reviewing a directed verdict, we credit
the favorable evidence if reasonable jurors could and disregard the contrary
evidence unless reasonable jurors could not.  Id.  at 827. 
We determine whether there is any evidence of probative force to raise a
fact issue on the question presented.  See,
e.g., Bostrom Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004); Szczepanik v. First S.
Trust Co., 883 S.W.2d 648,
649 (Tex. 1994) (per curiam). 

A directed verdict is warranted when
the evidence is such that no other verdict can be rendered and the moving party
is entitled, as a matter of law, to a judgment.  See B
& W Supply, Inc. v. Beckman, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st
Dist.] 2009, pet. denied).  A trial court
may order a directed verdict in favor of a defendant when: (1) a plaintiff fails to present evidence raising a fact issue
essential to the plaintiff’s right of recovery; or (2) the plaintiff admits or
the evidence conclusively establishes a defense to the plaintiff’s cause of
action.  See Prudential Ins. Co. of
Am. v. Fin. Rev. Servs., Inc.,
29 S.W.3d 74, 77 (Tex. 2000).  A trial
court may properly direct a verdict if no evidence of probative force raises a
fact issue on the material questions in the lawsuit.  See id.

However, the trial court errs if it directs
a verdict when a material issue is raised by the evidence.  See Hycarbex, Inc. v. Anglo-Suisse, Inc., 927 S.W.2d 103, 107 (Tex.
App.—Houston [14th Dist.] 1996, no writ). 
If there is any conflicting evidence of probative value on any theory of
recovery, a directed verdict is improper and the case must be remanded for the
jury to determine that issue.  See
Szczepanik, 883
S.W.2d at 649.  If reasonable minds could
differ as to the controlling facts, a trial court errs if it grants a directed
verdict and refuses to submit the issues to the jury.  See Latham v. Castillo, 972 S.W.2d 66, 68 (Tex. 1998).   

Express Easements 

“An easement is a non-possessory interest that authorizes
its holder to use property for a particular purpose.”  Koelsch v. Indus. Gas Supply Corp., 132 S.W.3d 494, 497 (Tex. App.—Houston
[1st Dist.] 2004, pet. denied) (citing Marcus Cable Assocs. v. Krohn, 90 S.W.3d 697, 700 (Tex.
2002)).  We interpret easements according
to basic principles of contract construction and interpretation.  Marcus Cable, 90 S.W.3d at 700; DeWitt County Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999); Koelsch, 132 S.W.3d at 497.  Courts construe contracts as a matter of law,
and we review their rulings de novo.  See
J.M Davidson, Inc. v. Webster,
128 S.W.3d 223, 229 (Tex. 2003) (applying rule in arbitration-agreement
context) (citing Coker v. Coker,
650 S.W.2d 391, 394 (Tex. 1983)).  The
intent of the parties, as expressed in the grant, determines the scope of the
interest conveyed.  Marcus Cable, 90 S.W.3d at 700–01; Koelsch, 132 S.W.3d at 497–98.  To interpret the parties’ intentions
adequately and to discern the scope of the rights conveyed to the easement
holder, we focus on the terms of the granting language.  See Marcus Cable, 90 S.W.3d at 701.  

We rely solely on the written terms of the easement unless
the language is ambiguous.  Koelsch, 132 S.W.3d at 498.  When terms are not defined, we give them their
“plain, ordinary, and generally accepted meaning.”  Marcus Cable, 90 S.W.3d at 701.  Courts
must consider the entire writing, assume that the parties intended to give
effect to every clause they chose to include, and strive to harmonize and give
effect to all the provisions of the contract by analyzing the provisions with
reference to the whole agreement.  Frost
Nat’l Bank v. L & F Distribs.,
165 S.W.3d 310, 312 (Tex. 1999); Koelsch, 132 S.W.3d at 498; see also Seagull Energy E & P, Inc.
v. Eland Energy, Inc., 207
S.W.3d 342, 345 (Tex. 2006).  “When
interpreting the granting language of an easement, we resolve doubts
about the parties’ intent against the grantor, or servient, estate and adopt the
interpretation that is the least onerous to the grantee, or dominant, estate in
order to confer on the grantee the greatest estate permissible under the
instrument.”  CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd., 264
S.W.3d 381, 388–89 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).  No rights pass to the easement holder by
implication except those that are “reasonably necessary” to enjoy the rights
that the easement grants expressly.  Marcus
Cable, 90 S.W.3d at 701.  Accordingly, if the grant expressed in the
easement cannot be construed to apply to a particular purpose, a use for that
purpose is not allowed.  See id.

Trespass and Breach of Contract 

The Rutherfords contend that the
trial court erred in directing verdict on their trespass and breach of contract
claims because they raised a fact issue with regard to each element of those
claims.  In response, CenterPoint asserts
that both claims require a showing that CenterPoint exceeded its rights under
the easement.  According to CenterPoint,
no evidence exists that it exceeded those rights by removing the trees and
other vegetation.  Therefore, it
maintains that the trespass and breach of contract claims fail as a matter of
law.   

A trespasser has neither express nor implied permission to
enter the property of another, but enters it nonetheless.  Mellon Mortg. Co. v. Holder, 5 S.W.3d 654, 671 (Tex. 1999); Koelsch, 132 S.W.3d at 497.  An easement holder who exceeds the rights
granted by the owner of the servient estate thus commits a trespass.  Compare Marcus Cable, 90 S.W.3d at 703 (reversing trial
court’s grant of summary judgment on trespass claim in favor of easement holder,
who had installed cable-television lines on easement, because easement document
only granted right to use land for purpose of constructing and maintaining
facilities to transmit electricity, not cable) with Koelsch, 132 S.W.3d at 499 (holding that no
trespass occurred where easement holder constructed above-ground block valve
assembly because easement document granted right to “lay, operate, renew,
alter, inspect, and maintain two pipe lines . . . upon, over, under and
through” property); CenterPoint Energy
Houston Elec. LLC, 264 S.W.3d 381, 388–89 (holding that no trespass
occurred where easement holder allowed assignee to install and use cellular
telecommunication equipment within easement because easement document granted
right of way for “all necessary and desirable appurtenances” including
“telephone and telegraph wires”).  A
party claiming trespass must establish that the defendant committed an act that
exceeded the bounds of any legal rights the defendant may have possessed.  See Koelsch, 132 S.W.3d at 497. 

To prevail on a breach of contract claim, a party must
establish that: (1) a valid contract existed between the plaintiff and the
defendant; (2) the plaintiff tendered performance or was excused from doing so;
(3) the defendant breached the terms of the contract; and (4) the plaintiff
sustained damages as a result of the defendant’s breach.  See Valero Mktg. & Supply Co. v.
Kalama Int’l, 51 S.W.3d
345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).  “A breach occurs when a party fails or
refuses to do something he has promised to do.” Dorsett v. Cross, 106 S.W.3d 213, 217 (Tex.
App.—Houston [1st Dist.] 2003, no pet.); see
DeWitt, 1 S.W.3d at 98 (holding that trial
court properly granted directed verdict in favor of electrical cooperative on breach
of contract claim, where cooperative had cut down two trees and trimmed another
in easement, because easement document gave cooperative right to “cut and trim
trees within the right-of-way.”).    

          As CenterPoint notes, an element
essential to both trespass and breach of contract is that CenterPoint’s action
exceeded the rights granted to it by the easement.  If the scope of the rights granted by the
easement included the removal of the trees and other vegetation in the
easement, then the action was authorized and the Rutherfords cannot prevail on
either claim.  

Here, the
easement granted CenterPoint an “unobstructed easement”, along with the right “to remove from said right-of-way and
land adjacent thereto, all bushes, trees, and parts thereof, or other
obstructions, which, in the opinion of [CenterPoint], endanger or may interfere with the efficiency,
safety or proper maintenance of said line or its appurtenances.” [Emphasis
added]  See Nalle v. Taco Bell Corp., 914 S.W.2d 685, 687 (Tex. App.—Austin
1996, writ denied) (holding that the word “may” means possibility) (citing Black’s
Law Dictionary 979 (6th ed.1990))).  Pakeltis stated that,
in CenterPoint’s opinion, all the trees and other vegetation that were removed
from the easement on the Rutherford’s property could have interfered with the
efficiency, safety, and maintenance of its transmission lines on the property. 
CenterPoint has a
general policy to remove all vegetation that can grow at least ten feet high in
a transmission easement because transmission lines have such high voltage.  In accord with this policy, CenterPoint’s
contractor removed all trees along the northern border of the easement and
other vegetation.  Coleman testified that
all vegetation he removed was at least ten feet or had the potential to grow at
least ten feet.  From a maintenance and
safety perspective, Pakeltis explained that trees of such height along the edge
of an easement may impede work on the transmission lines because CenterPoint
must position large trucks between the outermost line and the edge of the
easement to safely complete certain maintenance and restoration projects.  In addition, he said that in the event that the
entire transmission line is destroyed CenterPoint may need the entire width of
the easement to replace the line and restore power.  From an efficiency perspective, Pakeltis
stated that controlling the trees at their youngest stage and removing them
from the easement before they become a problem is the most cost-efficient
method to maintain the transmission lines.  Because CenterPoint offered its opinion that
the trees and other vegetation it removed from the easement could have
interfered with the efficiency, safety, and maintenance of the transmission
lines, CenterPoint acted within in the scope of the express easement when it
removed the vegetation.  

The Rutherfords point out that
CenterPoint removed “border” trees more than fifty feet away from the nearest
power line, and that it removed trees that could not be any sort of
obstruction.  CenterPoint did not remove
the trees underneath the transmission lines on the Edwards Cemetery property,
and these trees have not endangered or impaired those lines.  The easement for the Edward Cemetery
property, however, has different terms than those in the easement for the
Rutherfords’ property.   Under the Edward
Cemetery easement, CenterPoint only has the right to trim the tops of the trees
in the cemetery at forty feet.  Under the
Rutherford easement, CenterPoint has right to remove all vegetation if, in its
sole opinion, the vegetation may interfere with the efficiency, safety, or maintenance
of the transmission line.  The
Rutherfords did not show any removal took place outside the easement.  The Rutherfords also point out that they
received no prior notice of the removal of the trees.  The easement, however, did not require that
CenterPoint provide them with notice prior to their removal.  

The Rutherfords correctly note that
the easement language allows them to construct a fence within the easement
property.  When read with the tree
obstruction provision, they argue, the express easement allows for at least
fence-high vegetation; CenterPoint’s right to remove vegetation is qualified by
the allowance for fencing.  We
disagree.  Although the Rutherfords can
fence and also plant trees on the land encumbered by the easement, CenterPoint
has an express right to remove the trees, unlimited by the fence provision and
limited only by its opinion as to the need to remove vegetation.  Although the clear-cutting operation here
appears to be overkill, it was within CenterPoint’s right to do it.[1]
 Accordingly, because the easement
authorized CenterPoint’s actions, the trial court did not err in granting directed
verdict on the Rutherfords’ claims for trespass and breach of contract.  

Negligence 

The Rutherfords maintain
that the trial court erred in directing verdict on their negligence claim
because they raised a fact issue with regard to each element of that claim.  According to the Rutherfords, Centerpoint had
a duty to comply with the terms of the easement and a duty to provide them with
notice prior to any tree trimming or herbicide application.  The Rutherfords assert that CenterPoint
breached these duties, and their breach caused them damages in the loss of the
trees.  In response, CenterPoint, citing DeWitt, contends that the Rutherfords
cannot bring a negligence claim because the contract, and not common-law negligence, governs their
dispute.  See DeWitt, 1 S.W.3d at
98.

In DeWitt, a landowner sued a power company
for breach of contract, negligence, and Deceptive Trade Practices Act
violations after the utility company cut down two trees that were on its
easement and trimmed another that had grown within the easement.  See id. at 98.  A main issue was whether the easement
agreement gave the utility company the right to cut the trees.  Id.  The landowners argued they could maintain the
negligence claim independently of the contract claim because, in the absence of
a contractual agreement, the utility company would be liable in negligence if
it entered the property and cut down the trees.  Id. at 105.  They also argued the damage was to the value
of the trees and not the value of the easement.  Id.  The Texas Supreme Court rejected this argument,
holding that the contract, and not common-law negligence, governs any dispute
between the parties in these circumstances. 
Id.  The supreme court concluded that the trial
court did not err in granting a directed verdict for the utility company on the
negligence claim.  Id. 

Here, like in DeWitt,
the main issue was whether the easement agreement gave CenterPoint the right to
remove the trees and vegetation.  The
easement spelled out the respective rights of CenterPoint and the
Rutherfords.  The contract, and not
common-law negligence, governs their dispute. 
See DeWitt, 1
S.W.3d at 98.  Accordingly, we hold that
the trial court did not err in directing verdict on the Rutherfords’ negligence
claim.   

Conclusion

We hold
that the trial court did
not err in granting directed verdict on the Rutherfords’ claims for trespass
and breach of contract because the easement authorized CenterPoint’s
actions.  We also hold that the trial court did not err in directing
verdict on the Rutherfords’ negligence claim because the contract, and not
common-law negligence, governs their dispute. 
We therefore affirm the judgment of the trial court.    

 

                             

                                                                   Jane Bland

                                                                   Justice


 

Panel
consists of Justices Jennings, Higley and Bland.











[1]
          We
note that the easement does not give the right to CenterPoint to administer
herbicide to the land. CenterPoint does so at its peril to the extent such
chemicals do more than merely “remove” existing plant obstructions.  But the Rutherfords did not complain in the
trial court or on appeal about the administration of chemicals separate from
the tree removal, so that is not a basis for reversal.